THE KENILWORTH.

KALT v. THE KENILWORTH.

(District Court, S. D. New York.  November 30, 1894.)

COLLISION—FOG—NEGLIGENT SOUNDING OF FOG HORNS—INATTENTION—DESERT-
ING INJURED VESSEL—ACT SEPT. 4, 1890.

> The large four-masted steel ship Kenilworth, sailing north, came in col-
> lision off Barnegat, at night, in a thick fog, with the small schooner
> Sawyer, which was beating to the south against a very light southerly
> wind.  The ship's yards raked and carried away the schooner's masts
> and rigging.  As they passed, the ship was hailed; but the master made
> no answer, and sailed away without stopping.  The fog horns were not
> heard on either vessel until within about three minutes of the collision.
> The report of the lookout on the ship could not be understood; and she
> had no aft-sails set to enable her to maneuver easily.  The mechanical
> fog horn of the schooner had not been previously tried, nor used in the
> fog of the previous day; it was claimed to have been brought out only an
> hour before this collision.  The schooner, after collision, was burnt and
> sunk by the master.  *Held*, (1) that the collision was presumptively caused
> by the ship's fault, under the act of September 4, 1890 (1 Supp. Rev. St.
> p. 800), and that she had not proved the contrary; (2) that the primary
> cause of the collision was the failure to hear timely fog signals, either
> because they were not properly given, or not properly attended to, on
> either side.  The damages were divided.

This was a libel by Hyron Kalt, owner of the schooner Flora A.
Sawyer, against the ship Kenilworth, for damages caused by colli-
sion.

Wing, Shoudy & Putnam, for libelant.

Benedict & Benedict, for claimant.

BROWN, District Judge.  At about 3 o'clock a. m. of Saturday,
May 19, 1894, during thick fog, a collision occurred at sea about 55
miles southeast of Barnegat light, between the libelant's small
schooner Flora A. Sawyer, bound south, and the ship Kenilworth,
inward bound for New York.

The Kenilworth was a four-masted steel ship of 2,178 tons net
register, 320 feet long by 40 feet beam, carrying a light cargo of tea,
and well out of the water.  The Sawyer was but 84 feet long and
of 93 tons net register, light laden, with 30 tons sand ballast, about
4,000 feet of lumber, provisions and tools.  The wind was about south
by west.  The ship had been previously heading about north; the
schooner being on her starboard tack and closehauled, headed about
southeast.  Each heard but two fog signals given by the other be-
fore the vessels came within sight of each other, when very near to-
gether.  Just before the collision each luffed; the schooner, about
a point and a half; and the ship, probably, about half a point.  The
port bow of the ship struck the schooner's jibboom, and broke it
off.  The vessels passed port to port, and the ship's main yard, rak-
ing across the schooner, carried away both her masts and every-
thing standing.  The ship was unharmed, but showed a broad hori-
zontal mark along her port bow, from contact with the jibboom or
bowsprit.  The schooner was so injured that she soon began to leak
rapidly, and not long after was abandoned by her officers and crew,
who took to the small boats and were afterwards, on the same day,

picked up by another vessel. Before leaving the schooner. the master, considering her worthless, and a dangerous obstruction, set fire to her. to prevent damage to other vessels. Each claims that the collision was by no fault of its own; the claimant contending that the accident was inevitable, inasmuch as from the time when the horns were heard, the ship did everything possible to avoid collision.

1. An important circumstance in the present case, however, is, that the master of the ship, who came on deck as the ship was passing the schooner but a few feet distant, made no answer to the hails that were heard from the schooner, inquiring what ship it was; nor did he stand by her, or endeavor to do so in the least, but proceeded on his course. as though nothing had happened. By the act of September 4, 1890 (1 Supp. Rev. St. c. 875, p. 800), it is enacted:

"That in every case of collision between two vessels it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew, and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master, or person in charge of the other vessel, the name of his own vessel and her port of registry, or the port or place to which she belongs, and also the name of the ports and places from which and to which she is bound.

"If he fails so to do, and no reasonable cause for such failure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect, or default."

I find nothing in the evidence in this case to make this act inapplicable, or to absolve the ship from the consequences declared by the act, viz., that the collision "shall be deemed to have been caused by the master's wrongful act, neglect, or default." The master saw that the schooner was dismasted and seriously damaged. He did not ascertain, or attempt to ascertain, that "she had no need of further assistance"; nor did he stay by her in the least. The only excuse offered is, that he had to ascertain the possible damage and condition of his own vessel. But to do this did not prevent his lying by at once, nor did it require or excuse his sailing away. The excuse given seems to me wholly frivolous. A few moments was sufficient to ascertain that no serious harm had been inflicted on his vessel. The hulls did not come in contact; and there was nothing whatever to prevent his answering the schooner's inquiries or taking immediate steps to stay by the schooner. "without serious danger to his own vessel."

For this infringement of a statute passed in the interest of humanity, I am bound to "deem the collision caused by the wrongful act of the master," unless, according to the statute, "proof to the contrary" appears; and I find no such proof appearing.

The lookout on the ship was a Manilla man, whose first report of the schooner could not be understood, and another lookout was sent forward. The ship, moreover, had not sufficient aft-sails set to enable her to luff readily, as might be needed in such an emergency in fog. An order to luff was first given, and then the order to set the spanker; but the collision came before the order could be executed. The defense of the ship is, in fact, that she was so large

that she could do nothing effectual to get out of the way. She should have had her canvas distributed in such a manner as to make her reasonably manageable; and a lookout whose reports cannot be understood, is insufficient. For reasons given below, it also seems to me probable that the fog horn was negligently sounded.

2. A striking circumstance in this case, is the evidently short time that elapsed, according to the testimony on both sides, between the hearing of the fog signals and the collision. The Sawyer was going not over one and a half knots, at the most; and the Kenilworth, as her witnesses say, not over two and one-half knots; so that they were approaching each other at the rate of about four knots only. As the signals were given at less intervals than two minutes apart, and as horns properly sounded ought to be heard from a half mile to a mile distant, it follows that from four to eight different fog signals ought to have been heard by each vessel during an interval of eight to fifteen minutes before collision; whereas only two signals were heard by either before the vessels were visible through the thick fog, very near together. They were then probably less than 400 feet apart, since neither was able to luff much before collision; so that the vessels must have been within 1,000 to 1,200 feet of each other when the signals were first heard by each. It is not credible that this could have happened had a proper lookout and proper signals been given by either. The City of New York, 1 C. C. A. 483, 49 Fed. 956, 957. And this, I am satisfied, was the primary cause of this collision.

The surrounding conditions in this case were wholly different from those in the case of steamers that fail to hear fog signals till near, when going at high speed, at the rate of 10 or 15 knots, with the attendant noises of steamship navigation, the dashing against waves, and the swash of waters from stem to stern. The Fulda, 52 Fed. 400, 402; The Saale, 59 Fed. 717. Here were very slow speed, a light wind, a noiseless sea, and a universal quiet that should have permitted fog signals to be heard a mile away. They were not heard one-quarter of that distance. If certain extraordinary conditions of fog might possibly account for the failure to hear on the one side (The Lepanto, 21 Fed. 651, 656) it cannot explain the failure on both sides. The only reasonable conclusion is, that there was lack of a proper watch and of proper sounding of the fog horns on both vessels. The testimony confirms this inference.

Considerable question has been made by the claimant's counsel whether the schooner's mechanical fog horn was used at all. The proof on that point is so specific that I do not feel justified in discrediting it, although that horn was not brought into use until an hour before collision. It was, however, an old horn, bought and put aboard the schooner for this voyage without being tried. There is no evidence as to its condition or sufficiency; and as it was destroyed with the vessel by the master, its sufficiency cannot now be tested. It is not a reassuring circumstance, nor does it add to the credit due to the master, or indicate any disposition on his part towards a diligent performance of the duties of navigation, that in the preceding fog of this night, and on the day previous, the master had not made use of this mechanical fog horn, but contrary to the requirements of

the law, had used the old tin horns instead; and that on the night of collision he did not at first use it, but brought it on deck out of his cabin at two o'clock in the morning, only an hour before collision.

Decree for the libelant for one-half the damages.