BOSTON TOWBOAT CO. v. WINSLOW et al.

(Circuit Court of Appeals, First Circuit. September 15, 1896.)

No. 158.

1. COLLISION—FAILURE TO STAND BY.
Where a schooner collided with one of two barges towed by a steam tug, and was swept on by the wind, and carried a considerable distance to leeward before the extent of her own injuries and peril could be ascertained, *held*, that in view of the fact that the injured barge was near land, and the steam tug and the other barge were at hand, the schooner should not be held liable because she proceeded on her course without returning to the assistance of the barge, or giving her name, as required by the statute of September 4, 1890, § 1 (26 Stat. 425).

2. SAME—RIGHT OF WAY—CHANGE OF COURSE.
Where a schooner and a steam tug approached each other nearly head on, and the schooner held her course, while the tug attempted to pass to windward, but, when the maneuver had been partially executed, endeavored to go back and pass on the other side, and a barge in tow of the tug floated directly in the path of the schooner, thus causing a collision, *held*, that the tug was liable for the damage to both barge and schooner.

Appeal from the District Court of the United States for the District of Massachusetts.

Lewis S. Dabney and Frederic Cunningham, for Boston Towboat Co.

Almon A. Strout, for Winslow.

William M. Richardson, for Joseph S. Harnis and others, receivers.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. At about 8:45 p. m. of October 16, 1893, there was a collision between the schooner Jacob S. Winslow and two barges towed by the steam tug Vesta. One of the barges, the Ellangowan, loaded with coal, was so badly injured that it was necessary to beach her; the other barge, the 56, had her masts carried away, and suffered other slight damage; and the Jacob S. Winslow lost her stem, and was otherwise damaged forward,—in all to the amount of $1,077.40. The place of collision was to the southward and westward of Tarpaulin Cove, between two and four miles. The sky was cloudy, and the night dark, but there was no fog or mist to obscure lights. The owners of the Ellangowan filed in New York a libel against both the schooner and the tugboat. The owners of the Winslow libeled the tugboat in the district of Massachusetts. Later the owners of the Vesta filed in the district court in the district of Massachusetts a petition for limitation of liability, contesting, at the same time, all liability to either the schooner or the barge, and alleging that the collision was caused wholly by the fault of the schooner Jacob S. Winslow. The owners of the barge and those of the schooner answered this petition, both maintaining the liability of the tug, though the owners of the barge did not abandon their contention that the schooner was also at fault, and liable to them. The district court in Massachusetts, after full hearing, entered its final decree, limiting the liability of the petitioners to the amount or value of their interest in the steam tug, upon her arrival in Boston, and in her freight money or towage then pending; and it held the tug solely responsible for the collision. The damages decreed to the barge Ellangowan and to the schooner Jacob S. Winslow did not together equal the value of the tug and her pending freight. From this decree the petitioners have appealed, assigning errors only in the findings of the court as to the responsibility for the collision. The owners of the Ellangowan, as well as those of the Jacob S. Winslow, contest the appeal before this court.

The evidence is uncontroverted that, after the collision, the schooner proceeded on her course without stopping to see if any assistance was required by the barge, and without giving her name, hailing port, or port of destination; and the appellants contend that for such omissions she should be held to have been in fault, according to the statute of September 4, 1890, § 1 (26 Stat. 425). It will be best to consider this question first. The statute referred to is far from peremptory in requiring that, when a vessel is chargeable with omission or failure in the respects enumerated in the act, the collision shall always be deemed to have been caused by the wrongful act, neglect, or fault of those in charge of her. It provides:

"That in every case of collision between two vessels it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance; and to render to the other vessel, her master, crew, and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master or person in charge of the other vessel the name of his own vessel and her port of registry, or the port or place to which she belongs, and also the name of the ports and places from which and to which she is bound.   If he fails so to do, and no reasonable cause for such failure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect, or default."

The purpose of this act was manifestly to supply the strongest motives of interest to overcome the temptation for masters of colliding vessels to heartlessly and inhumanly abandon and leave to their fate distressed vessels and their crews, in order to conceal and escape liability for a collision.   While the courts should so administer the law as to effectuate the benign object of the statute, they should not unduly extend its application, nor disregard the conditions it imposes. The duty of the master to stand by and to do the other things named in the statute is a qualified obligation.   "If and so far as he can do so without serious danger to his own vessel, crew and passengers," is the first and chief condition.   Who shall decide those questions, in the first instance, in the moment of emergency?   We have no doubt it is the person charged with watching over and securing the safety of his own vessel, and the lives of all on board her; that is, the master.   He must, as well as he can in the emergency, regard and weigh all existing conditions, and ought not to be held culpable for an error of judgment.   The court's duty is to ascertain and consider the state of affairs under which he acted.   It will not accept the excuse that, in his judgment, at the time, the safety of his vessel and crew and passengers forbade his standing by, if the evidence shows that he hastily and recklessly, or without any apparent necessity, sailed away, or willfully concealed facts he was bound to disclose. He must act with the coolness and the courage demanded by his position and rank, and must be inspired with an active sympathy for those who are in peril and distress.   If he has shown proper care and spirit in forming his judgment, he ought not to be condemned because another would have acted differently, nor because later developments show that he was too cautious.   The duty to stand by is primarily in order "to render to the other vessel, her master, crew, and passengers, such assistance as may be practicable, and as may be necessary in order to save them from any danger caused by the collision"; and it continues only until it is "ascertained that she has no need of further assistance."   In deciding upon the practicability of giving assistance, the actual or the seeming condition of his own vessel is an important consideration for each master.   As to the need of assistance, he should be largely, but not wholly, influenced by the request of the other vessel.   He may, notwithstanding such request, to a reasonable extent be governed, as to how long he shall stand by, by his own intelligence, but only upon careful examination of the condition of that vessel, and paying due regard to the time, the place, the state

of the weather and of the sea, the nature of her cargo, the extent and character of her injury, and the presence or absence of other available assistance. He is not bound to stand by, and submit to delay, simply to quiet the unreasonable or cowardly fears of others. The statute permits him to show reasonable cause for his failure to do the things it enumerates, and, even when such reasonable cause is not shown, it is only in the absence of proof to the contrary "that the collision shall be deemed to have been caused by his wrongful act, neglect, or default." Thus, the statute requires many things to be settled before its penalty is pronounced.

In the case now before the court, the collision was near land; the tugboat, uninjured and with steam up, was at hand; one of the two barges was very little injured in her hull, and her crew were close by, to assist if necessary; the hour was early; the sea was smooth, and the wind not more than a six-knot breeze, probably less than five knots; the crew of the Ellangowan called upon the steam tug for help, but not upon the schooner; and, although the barge was loaded with coal (a bad cargo), Capt. Clark, of the schooner, might well consider that she had at hand all the assistance which was required. If he did so think, the result showed he was in no error. Besides, his own vessel, striking, nearly head on, the side of a large barge heavily loaded, was injured; how much he did not know and could not at once tell. His first duty was to look to the condition of his vessel, which he promptly proceeded to investigate. The vessels did not remain foul of each other, but the schooner rebounded from the blow, and was swept away from the barge first struck, carrying away the masts of the second, and still receding. The case was very different from what it would have been had the two vessels remained foul of each other, and required time and labor to separate them, and if, when they had got clear, the sails of the Winslow had been trimmed, and she had silently sailed away. Here was collision and instant separation. Nothing was done on board the Winslow to quicken her departure, by any handling or trimming of her sails. She could not, at once be brought back to the barges, and, by the time that the extent of her own injury and the degree of her peril could be examined, a wide interval separated her from the barges to the windward, and then the tug had gone to their assistance. To return to a position where the crew of the Winslow could have rendered assistance to the master, crew, or passengers of the barge, the schooner must have come about, and beat back to them. It was right first to determine if that could be done or attempted with safety to herself, her crew and passengers, and, next, if it would probably be of any use. In the condition of his schooner, as, on examination, the master found it to be, the difficulty of returning to the barge was not insurmountable, and, but for the presence of the tugboat and other assistance, it would have been his duty to return as quickly as possible. There is nothing in the evidence disclosing on the part of Capt. Clark any indifference to or reckless disregard of his duty towards the vessel with which he had collided, and this court cannot say that, in view of all the circumstances surrounding him, he was not warranted in believing that he had ascertained that no further assistance was necessary. The failure to give the name of the schooner and the other

items of information named in the statute, for which, by the way, no demand appears to have been made, seems to have been a result of immediate separation of the vessels, and not caused by any purpose of escape and concealment.

The facts in this case differ materially from those of The Hercules, 70 Fed. 334, and of The Kenilworth, 64 Fed. 890, in both which the collision took place in a fog. Both vessels were called on for assistance, and, though uninjured, sailed away without heeding the calls. The Kenilworth heard, when only a few feet distant, the hail inquiring what ship it was, and made no answer, "but proceeded on her course as though nothing had happened," without standing by or endeavoring in the least to do so. The facts in regard to the Hercules were similar. The schooner with which she had collided was in a sinking condition, and her crew "called upon the tug for assistance by signals and shouts, and firing shot cartridges from a Winchester rifle three times. This proved of no avail, and the tug disappeared, and was not heard of again"; and this, although, so far as the report shows, no other possible help was near.

So, too, in the case of The Robert Graham Dunn, 63 Fed. 167, the district court, speaking on this subject, says, "The conduct of the officers was inexcusable, and their account of the collision is wholly unreliable." And the circuit court of appeals, affirming the decree (17 C. C. A. 93, 70 Fed. 270), says:

"There can be no question, upon the evidence disclosed in the record, that the court below was right in holding that the master of the Robert Graham Dun failed, without reasonable excuse, to perform the duty imposed on him by the act of September 4, 1890, to lie by after the collision, and to render assistance to the men on the Captain John, and that the subsequent drowning of the three men on the latter vessel must be attributed to this neglect of duty."

We do not think, upon the evidence now before us, that the Jacob S. Winslow should be condemned under the act of September 4, 1890. If she is to be held liable at all, it must be because of some fault in her navigation contributing to the collision. This opinion of the effect of the act of 1890 is confirmed by the fact that the second section provides that, for any omission or failure of the duty imposed by the first section, the master shall be deemed guilty of a misdemeanor, and liable to a penalty of $1,000, or imprisonment for a term not exceeding two years, the vessel liable to be seized and proceeded against by any person, for the pecuniary penalty; one-half of such sum to be payable to the informer, and the other half to the United States. To such a statute the rule of strict construction of penal statutes applies.

When we come to seek for the cause of the collision, we meet with the conflict and contradiction of testimony common in such causes. In respect to the time and place of the collision, the state of the weather and the sea, the nature and direction of the blow, and the portions of the two vessels that came in contact, there is no material difference. It is quite otherwise in regard to the speed of the schooner, the direction of the wind, and the precedent management and navigation of the tugboat and of the schooner. The tugboat was towing, strung out astern of her, two loaded barges. The length of herself and her tows was about 1,500 feet. Her speed is admitted to have been about four knots, and her general course was east-north-

east. The schooner was a four master, of 865 tons, on a voyage from Salem to Philadelphia, without cargo or ballast. It is not denied that before and at the time of the collision her regulation red and green lights were properly set and burning clearly. Her general course was west-southwest. The tugboat also had her side lights and two white lights to show that she was engaged in towing, all properly placed and burning. The Ellangowan was carrying, as required, red and green lights. One witness, belonging to barge 56, says she had no lights. Some of the witnesses for the schooner testified to seeing at one time three green lights, and at another three red ones, indicating proper lights on the tugboat, and on both the barges she had in tow. Capt. Degen, of the tugboat, testifies that the barges had their lights set. "Did the barges have their lights set? Ans. They did." The petition alleges "that the said steam tug and barges all had the lights required by law, set as required by law, and brightly burning, and were proceeding through Vineyard Sound at the rate of between three and four miles per hour, heading east-northeast." In argument, the proctor for the petitioners, assuming that full reliance must be placed on the witness who says the 56 had no lights, lays great stress on the inaccuracy of the schooner's witnesses on this point. If, in fact, no lights were shown on barge 56, their inaccuracy is no worse than that of the captain of the tug, or than the statements of the petition. We perceive no reason to suppose there was on either side any willful and deliberate untruthfulness, and do not deem it important to determine which is the correct statement. That those on the schooner did early see lights of the tugboat, and on one, at least, of the barges, is beyond question; and the navigation of the schooner was determined by those lights no differently whether there were three sets of lights or two. There is no suggestion from any one that she would have been managed any differently if there had been more or less lights shown by the tugboat and her tow. The schooner, in any case, was bound to hold her course, and the tugboat to keep clear.

The direction of the wind at the time has an important bearing upon the question of the movements of the schooner, and in regard to this question there is great conflict of testimony. But the court is satisfied that the wind varied between northwest and north-northwest, and that the schooner pursuing the general course of west-southwest through the sound, and sailing within six points of the wind,—not absolutely closehauled,—veered somewhat with the wind, but was kept as closely to her course as was practicable. Her captain, who was in charge of the deck, her first officer, and the man at the wheel, all testify positively that, when the tugboat and her tow were reported by the lookout, the order to the man at the wheel was to keep the course. The man at the wheel of the schooner says he strictly obeyed that order, and kept his course as steadily as possible. No other order could be expected from a seaman of the experience of Capt. Clark under the circumstances, and the record discloses nothing inclining us to discredit his statement, corroborated, as it is, by the mate and the wheelsman. They all agree that no change was made of the schooner's wheel until the tugboat, which had got across the schooner's bow to the windward, suddenly turned back under a port

wheel, and ran back to the leeward, so close under the bow that she cleared only by the space of from 5 to 15 feet. The lookout, the captain, and the mate of the Winslow place the tug when first seen about a point on their port bow. The man at the wheel says that, when the tug was reported, he could not see her lights, because the schooner's sails hid them, but that, stooping and looking under the sails, he saw them a very little on the port bow. Belmont, who was steering barge 56 as closely in the wake of the tugboat as he could, says the two lights of the schooner were right ahead when he first saw them. The witnesses in behalf of the petitioners, on the other hand, say that the schooner was on the starboard bow of the tugboat. They vary in their estimate, from a very little on the starboard bow to two points. It is apparent that these witnesses are not all speaking of the same time. After very full comparison of the whole evidence, this court is convinced that the wind was generally but little to the north of northwest, varying slightly from time to time, now somewhat towards the north, and now a little westward; that the schooner was sailing on a west-southwest course, swinging a little as the wind veered, but substantially holding her course, and that she was not more than six points from the wind; that, as the vessels approached, they were very nearly head on, as each saw both lights of the other, though the preponderance of evidence is that the schooner was a very little to the windward; that the schooner held her course; and that, the tugboat having the right to go on either side, there was so much delay in making the election that, when her helm was starboarded to go to the windward, there was very slight room for the maneuver, though, if it had been steadily pursued, it might possibly have been safely accomplished; but, when it had been partially executed, the captain of the tugboat doubted his ability to clear the schooner that way, endeavored to go back and pass on the other side, and in that endeavor left the tow to forge ahead directly in the path of the schooner, and barely cleared the schooner with his tugboat. By so going under the schooner's bow, he made it impossible for her to avoid both the tugboat and her tow.

The decree of the district court is affirmed, with interest, and with the costs of this court for the appellees.