BRAWLEY, District Judge.
The decree of the court below holding both vessels in fault for the collision in the libel mentioned, and there being no appeal in behalf of the schooner, our attention will be limited to the consideration of the fault imputed to the tug. The learned judge, in his opinion, holds that “the tug was in fault in failing to stand by the schooner after the collision, as well as in other particulars not material to the decision.” The Morgan was a three-masted schooner, loaded with coal, which sailed from Hampton Roads on March 24, 1893, bound for New Haven. The steam tug Hercules, having in tow the barge Charter Oak on a 200-fathom hawser, was bound south to Norfolk. The collision occurred between half past 10 o’clock and 11 o’clock at night in the Atlantic Ocean, about 20 miles to the southward of Winter Quarter Shoal lightship, and about 40 miles from Cape Charles lightship. The tug struck the schooner on the port side, between the fore and the main rigging, and cut down into her timbers, making a large aperture. The schooner was promptly hauled up in the wind and hove to. She proved to be in a sinking condition, and,, spite of all efforts to staunch the leak, the water gained so rapidly that her master endeavored to make port, but was unable to do so, and at 5 o’clock the water had so increased in the hold that the crew were obliged to take to the small boat, and were rescued the same morning by a passing tug. The schooner sank at 6 o’clock in the morning of March 25th, about seven miles northeast of Winter Quarter lightship. At the time of the collision the schooner was making about 5 or 6 knots an hour. The tug was making from 2-J to 4 knots an hour, the wind and tide being against her. There was a heavy sea running, and a thick fog.
The testimony, as is usual in such cases, is more or less conflicting. As the collision occurred in the open sea, in the nighttime, and in a thick fog, the rule which requires a steam vessel to keep out of the way of the sailing vessel must be construed according to the circumstances. That it was the duty of the tug to proceed slowly in such weather is clear. The officers and men aboard of her say that she was making from 2 to 2% knots an hour, but the court below finds that she was moving at about 4 knots. It does not hold that this was too rapid a speed, and it is not clear to us that the rate of speed can be imputed to her as a fault. The Martello, 153 TJ. S. 70, 14 Sup. Ot. 723. Nor is it clear to us that there was any failure on the part of the tug to keep a proper lookout, or in giving the proper signals. The testimony in her behalf was that everything was done that ought to be done. The court below, which had the advantage of hearing that testimony, has not found her at fault in either particular. The testimony of the master in charge was that immediately before the collision he heard one faint blast of the fog horn aboard the schooner; that he put his wheel a-port, and in a second or two saw a red light. The testimony showed that the schooner was not provided with a mechanical fog horn, as required by law, and for this the court be- • low has held her in fault. As it is not dear from the testimony that there was any act of commission or omission on the part of the tug tending to bring about the collision, and as the opinion of the *1000 court below, which was made a part of the decree, has not pointed out such fault, it remains to consider only the correctness of the conclusion which holds the tug responsible in one-half of the damage for its conduct after the collision in failing to stand by. The act of September 4, 1890 (1 Supp. Rev. St. [2d Ed.] p. 800), provides:
“Section 1. That in every ease of collision between two vessels it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew, and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew, and passengers (if any), such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master or person in charge of the other vessel the name of his own vessel and her port of registry, or the port or place to which she belongs, and also the name of the ports and places from which and to which she is bound. If he fails to do so, and no reasonable cause for such failure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect, or default.
“Sec. 2. That every master or person in charge of a United States vessel who fails, without reasonable cause, to render such assistance or give such information as aforesaid shall be deemed guilty of a misdemeanor, and shall be liable to a penalty of one thousand dollars, or imprisonment for a term not exceeding two years; and for the above sum the vessel shall be liable, and may he seized and proceeded against by process in any district court of the United States by any person, one-half such sum to he payable to the informer and the other half to the United States.”
There is some conflict in the testimony as to the conduct of the tug after the collision. The master, mate, and fireman of the tug testify to efforts made to find the schooner, and that she disappeared in the darkness and fog, and could not be found, and that the usual signals of distress were not given or heard; but, inasmuch as the court below has found that she did not stand by, we will assume the correctness of that finding, and consider whether, for that reason alone, the tug should be held responsible. Our act is a copy of one which has long been in force in England, the only material difference being that while, under the English statute, the punishment inflicted is a revocation of the master’s license, the second section here makes it a misdemeanor, punishable by fine and imprisonment. Both are in the nature of penal statutes designed to punish the master for the neglect of that duty which considerations of humanity alone impose, and which, long before either act, was recognized as a duty in the admiralty jurisdiction. It is creditable to the merchant marine of both countries that few cases are reported where the failure to stand by and render assistance have come before the courts, and this case is not presented in an aspect which permits an expression of opinion as to whether the master of the tug is liable to punishment for the omission to do what the statute required. We have only to determine whether, by reason of the statute, we are bound to presume, that he has been guilty of some “wrongful act, neglect, or default,” because there has been an “absence of proof to the contrary.” In a. case where the testimony has been full respecting all the acts and incidents leading up to the collision, and the judge who heard the same has failed to predicate a decree against the tug because of any acts or omissions on the part of the master or others, tending to *1001 produce it, and where our examination of the testimony fails to convince us that the collision was brought about by their fault, it would be a violent construction of the statute to hold that by reason of it alone the tug should be held responsible because of an omission of duty after the collision, and that, too, in the face of a decree not appealed from, holding, that, in part at least, such, collision was due to the negligence of the schooner. The case would be different if there had been an absence of proof as to the collision itself,—if, for example, the crew of the schooner had not been rescued, as happily they were, and for that or other reasons there was a lack of testimony respecting it, then the failure to stay by, unless explained, would have raised a presumption that the collision was caused by the wrongful act, neglect, or default of the master of the tug. It is in such cases that the statute becomes operative and, in “absence of proof to the contrary,” fastens the responsibility upon those who, failing in one duty, which was plain, may reasonably be charged with that which was doubtful. When one, disregarding cries for assistance, runs away from the scene of a crime, a strong presumption arises that he has committed it; but where there is positive proof by eye-witnesses that he did not, he cannot be convicted of it simply because he ran away, although he might be convicted of running away, if that were made a penal offense. So we construe this statute to mean that, if a master of a vessel that has been in collision with another fails to stay by her, and shows no reasonable cause for such failure, the law will presume that the collision was caused by some negligent act or omission on his part, and, in the absence of proof to the contrary, will fasten upon him the responsibility for the collision. It puts upon him the burden of showing that he was free from fault. It assumes that one who fails to offer assistance to those whose distress is caused by him is presumably at fault in the act which caused tht distress, and it denounces pain and penalties against his inhumanity, and holds his ship responsible for the pecuniary fine; but it does not condemn without a hearing. ' The obligation imposed is not unqualified; it is carefully guarded by conditions; it permits presumptions to be rebutted by proofs, and it is only “in the absence of proof to the contrary” that his responsibility is made absolute.
In The Queen of the Orwell, 1 Marit. Law Cas. 300, the eminent I>r. Lushington thus construes the English statute:
“Now, for the penalty, or what may be called the penalty, ‘in case he fails so to do, and no reasonable excuse for said failure,’ it shall be attended with certain consequences which are enumerated in the enactment. The effect of that, I think, is precisely what has been stated,—that, supposing such a' state of things to occur, there is thrown upon the party not rendering assistance the burden of proof that the collision was not occasioned by his wrongful act, neglect, or default. It does not go further. Assuming this case to come within the provisions of the statute, the proper question I shall have to put to you is that which I should put if no such statute at all existed,—whether this collision was occasioned by the wrongful act, neglect, or default of the steamer.”
The conceded violation of any statutory requirement creates a presumption against the party "in default, but this rule cannot be extended further than to hold that when an accident occurs it is obligatory upon the party who has failed to comply with the statute to *1002 show that such default certainly did not and could not possibly contribute to the disaster.
Conceding the correctness of the conclusion of the court below that the master of the tug failed to stay by and rénder assistance, his conduct is to be gravely reprehended, and in a proper proceeding doubtless he may be made to suffer the penal consequences that follow the violation of the statute; but to hold that such violation makes the tug responsible, in all events^for the collision itself, is to extend its-meaning beyond its plain words. While such misconduct creates the strongest presumption against it, and requires that the tug should show affirmatively that the collision was not due to its fault or neglect, when such “proof to the contrary” has been offered, we find no-authority in reason or precedent for holding it responsible. The English cases under the statute are The Adriatic, 3 Asp. 16; The Vallego, Ad. Div. April 27, 1887; The Germania, 21 Law T. (N. S.) 44. The American cases are The Robert Graham Dunn, 63 Fed. 167, affirmed 17 C. C. A. 90, 70 Fed. 270; The Kenilworth, 64 Fed. 890; Towboat Co. v. Winslow, 22 C. C. A. 327, 76 Fed. 595. In all of these cases there was evidence either of some fault in addition to the failure to stay by or an absence of proof that the vessels held responsible were not in default. They are, therefore, clearly distinguishable from the case now under consideration, where the evidence showed fault on the part of the schooner sufficient to cause-the collision, in her failure to provide herself with the mechanical fog horn, which the regulations require. In The Pennsylvania, 19 Wall. 137, where a bark was provided with a bell instead of a fog. horn, the court says:
“How can it be proved that, if a fog horn had been blown, those on board of the steamer would not have heard it in season to have enabled them to cheek their speed or change their course, and thus avoid any collision? Though there were two lookouts on the steamer, each in his proper place, the bark’s-bell was not heard until the vessels were close upon each other. Who can say the proximity of the vessels would not have been discovered sooner if the bark had obeyed the navy regulations? * * * The truth is, the caséis one in which, while the presumption is that the failure to blow a fog hom was a contributory cause of the collision, and while the burden of showing that it was in no degree occasioned by that failure rests upon the bark, it is-impossible to rebut the presumption.”
In The Martello, 153 U. S. 65, 14 Sup. Gt. 723, the bark was provided with a tin fog horn, not sounded by mechanical means. The-proof in that case, as in this, was that one blast of the horn was-heard aboard the steamer, which was proceeding at the rate of six miles an hour. The court held that, while such speed may not be excessive, even in a dense' fog, upon the open ocean, a different rule-applies to a steamer just emerging from the harbor of the largest port on the Atlantic coast, and found that a speed of three miles an hour was proper under those circumstances. It says: “If the barkentine had been provided with a more powerful horn, it appears to-be not only possible, but probable, that more than one blast would have been heard, and the steamer thus apprised of the course and distance of the bark,” and quotes with approval the opinion of Sir-Robert Phillimore in The Love Bird, 6 Prob. Div. 80, to the effect *1003 that under such circumstances the burden was on the bark to show “that by no possibility could the presence of a fog horn have prevented the collision, for it might possibly have given more warning to the other vessel.” The court below having found that the schooner was in fault in not having a mechanical fog horn, and that this was one of the causes of the collision, we are of the opinion that it was a cause sufficient to account for it; and the testimony not showing any wrongful act, neglect, or default on the part of the tug which tended to produce it, our conclusion is that there is such “proof to the contrary” as relieves the tug from responsibility under the statute. The decree of the district court is reversed.