## THE PROVIDENCE. THE GEORGIA. POTTER v. HARTFORD & N. Y. TRANSP. CO.

### (District Court, D. Rhode Island. July 11, 1922.)

### Nos. 1487, 1488.

**1. Collision &⇒80—Steamship held solely in fault for collision with meeting vessel in fog.**

A collision in a dense fog between a steamship, moving up Providence river in a channel 600 feet wide, and a gas lighter, coming down, *held* due solely to the gross fault of the steamship in navigating on the wrong side of the channel at excessive speed and without a lookout; the fault of the lighter in failing to stop her engines on hearing the signal of the steamship ahead, as required by article 16 of the Inland Rules (Comp. St. § 7889), not being a contributing cause in the situation shown by the evidence.

**2. Collision &⇒82(2)—Assumption that meeting vessel will navigate properly does not justify violation of rule.**

A steam vessel, navigating a channel in a fog and hearing the signal of an approaching vessel ahead, is not justified in failing to stop her engines, as required by article 16 of the Inland Rules (Comp. St. § 7889), because she is on her proper side of the channel, and on the assumption that the meeting vessel will keep to the other side.

**3. Collision &⇒84—Vessel disobeying rule has burden of proving that her fault was not contributing cause.**

A vessel, disobeying an imperative statutory rule, has the burden of proving that her fault could not have been a contributory cause of a collision.

In Admiralty. Suit for collision by James A. Potter and others, owners of the gas lighter Providence, against the steamship Georgia, and by James A. Potter, administrator of the estate of Manuel Williams, deceased, against the Hartford & New York Transportation Company. Decree for libelant in each case.

Frank Healy and Archibald C. Matteson, both of Providence, R. I., for plaintiffs.

Harrington, Bigham & Englar, of New York City, for defendants.

BROWN, District Judge. These libels relate to a collision between the steamship Georgia and the gas lighter Providence, in a dense fog, near Bullock Point lighthouse in the Providence river, about 5:30 a. m., daylight saving time, August 21, 1920.

The Georgia, 280 feet long, 50 feet beam, 13–13½ draft, was going

---

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

up the river, carrying 241 passengers and a cargo, on her regular trip from New York to Providence, R. I. The gas lighter Providence, 64 feet over all, 22 feet beam, 5 feet draft, with a deck load of 39,000 feet of lumber, was going down the river. The stem of the Georgia struck the starboard quarter of the Providence about 6 feet from her stern, cutting off her stern and sinking her almost immediately. One of the crew of the lighter, Manuel Williams, was drowned.

The wreck of the Providence was located on the bottom at the westerly side of the dredged channel, in the path of outgoing vessels, southwesterly from Bullock Point light.

The Georgia was so clearly at fault that her liability is not contested. The brief filed in her behalf relates chiefly to charges of contributory faults of the Providence.

[1] The Georgia had no lookout; she was navigating at excessive speed in a dense fog, on the wrong side of a narrow channel, and was also grossly at fault in failing to stand by, and in proceeding after a brief stop without taking adequate measures to ascertain what she had struck. It is evident that had a lookout been stationed at her bow he could not have failed to see the collision, as did several passengers, and to have reported that men from the lighter were in the water, needing immediate assistance. The negligence as to lookout led directly to her failure to stand by. Her ignorance of what she had struck is inexcusable. Knowing that she had struck something, her failure to stop and find out what it was was a gross fault, for which she gives no sufficient excuse. That the steamer Concord was following her was no excuse, as there was abundant time to warn her by signals.

Several passengers of the Georgia testify to hearing shouts of the men on the lighter and to seeing a man overboard. The Concord heard the shouts of the man, stopped at 5:40 a. m., and dropped a boat, which picked up three men. The fourth was drowned.

Was the Providence also at fault?

The vessels were in the fog but a few minutes before the collision. It is contended for the Georgia that she slowed from full speed of 13½ or 14 knots when she entered the fog, about two minutes before the collision, and ran under one bell until a few seconds before the collision. The Providence met the fog just above Black Buoy No. 5, which she made and passed about 30 or 40 feet on her starboard hand. She heard two or three signals from the Georgia, and herself gave three or four signals. Capt. Beetle of the Providence says he blew twice before hearing the Georgia. He had definitely located his own position as well over on the westerly edge of the dredged channel, on a course S. ¼ E., which would have brought him to the next Black Buoy No. 1A. He testified: "I knew where I was, and I knew where it [Georgia] ought to be." The width of the dredged channel is 600 feet.

The speed of the Providence, which is a very slow boat, with a maximum speed of 4 knots, when she made and passed Buoy No. 5, about 1,300 feet above the point of collision, was about 4 knots over the ground, with an ebb tide of about 1½ knots, and was not reduced up to the moment of collision. Her engines were not stopped, though she heard the first signal of the Georgia about two minutes before the collision.

The most serious fault charged to the Providence is noncompliance with article 16:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained, shall, so far as circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

Comp. St. § 7889.

She gives two excuses: First, that she was in her right position, well over on the westerly side of the dredged channel, which at this point is about 200 yards wide, and in water prohibited to the Georgia, which was required to keep to the easterly side; and, second, that she could not maintain control at a less speed.

I am unable to give weight to the second excuse. See The Sagamore, 247 Fed. 743, 159 C. C. A. 601.

It is a well-known fact, and the testimony shows, that the Georgia and other steamers navigate this narrow channel in all conditions of weather, day and night, in fog and clear weather. Their exact course is well known and well defined. It is also a fact that both vessels had definitely located themselves by known marks a very few minutes before the collision. But, while the Providence was on a straight course, the Georgia, after leaving her last mark, the Red Buoy just above Conimicut Light, on a course N. W. ½ N., made changes to N. W. by N., to N. W. by N. ½ N., and to N. ¼ W. The Georgia, according to the testimony, must have considerably overrun the middle line of the channel and got much too far to the west before making her turn to N. ¼ W.

[2] While it is doubtless a fact that the steamers are generally able to keep close to their proper courses, I am of the opinion that the master of the Providence was not justified in relying absolutely upon the ability of the steamer to do so in a dense fog, and was not excused from compliance with article 16 by stopping his engines. Law of Rule of Road at Sea, Smith, p. 251.

The compass course of the Providence was S. ¼ E. The course of the Georgia, after her last turn, was N. ¼ W. Had the Providence stopped her engines the ebb tide would have carried her on at a rate of 1½ knots. For the Providence it is contended that, if she had stopped her engines upon the first signal of the Georgia, two minutes before the collision, she would have gone with the tide alone 300 feet, and, assuming that she had come down to half speed of her engines, she would have been within 200 feet of the Georgia, which, coming on blindly, would still have struck the Providence, even had she been dead in the water. The contention is that, as the vessels were proceeding head on, the only effect of a reduced speed of the Providence would have been to render her helpless to control her movements, and to have changed the place of collision a few feet up the river on the same line.

It seems probable that the collision would have been more dangerous to the Georgia, but for the change of the wheel of the Providence upon sighting the white light of the Georgia a little on the starboard bow.

Capt. Beetle estimates the distance of sighting the light at 200 to 250 feet, and states that as soon as he saw it he "rolled the wheel hard down and went to port. Just before she hit, I let the wheel go again to see if she wouldn't straighten back again; kind of hit on a glance." The Providence was struck about 6 feet from her stern. No evidence that the Georgia suffered from the impact has been brought to my attention.

[3] As the Providence was guilty of a breach of an imperative statutory rule, she has the burden of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Lie v. San Francisco & P. S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726; The Beaver (D. C.) 197 Fed. 866; Id., 219 Fed. 134, 136 C. C. A. 32. The facts in this case are substantially different. In The Beaver, 219 Fed. 134, at page 137, 136 C. C. A. 32, at page 35, it is said:

"Had the master of the Selja stopped her engines when he first heard the whistle of the Beaver, practically right ahead, * * * manifestly the collision could not have occurred, for at the rapid and unlawful speed at which the Beaver was going she would necessarily have passed the point of collision."

It was expressly found, as matter of fact, that the failure to observe the statutory rule contributed directly to cause the collision. It brought the Selja "to the fateful point of intersection of the two courses." Had she stopped her engines, the Beaver would have passed and cleared her.

No such finding is possible in the present case. Observance of the second paragraph of article 16, by stopping her engines, would have left the Providence still in the course of the Georgia. If the momentum of the Providence was somewhat greater than it would have been had she stopped her engines, this excess momentum was not the cause of her being in the path of the Georgia, but, on the contrary, served rather to give greater effect to the effort of the Providence in extremis, to get out of the way by turning her head to port, on sighting the white light of the Georgia, slightly on her starboard bow.

The principal question is whether a speed reduced by the stopping of the engines of the Providence would have given the vessels substantially more time to avoid each other, after the exact positions were determined by sight.

The Georgia, upon sighting the white light of the Providence a little on her port bow, and seeing it shut in on the Georgia's flag pole, immediately gave the order, "Hard to starboard the wheel," "Stop," and "Reverse the engines"; all signals being practically simultaneous. Pilot Angell of the Georgia testified that the fog was as dense a fog as he ever saw. The seeing distance is put at about 200 feet; a distance less than the length of the Georgia, which the Georgia alone would cover in less than half a minute at her then speed. Furthermore, the light of the Providence was first seen a few seconds after a change of 2½ points in the Georgia's compass course, which required observation of the compass.

The contention for the Providence that the collision was inevitable from the time the Georgia took her turn to N. ¼ W., even if the Providence had stopped her engines at Buoy No. 5, seems to me well founded. Any reduction of speed which the Providence might have made by

stopping her engines would not have taken her out of the Georgia's path.

It appeared from the testimony of Angell, pilot of the Georgia, that upon sighting the Red Buoy just above Conimicut, the course N. W. by N. was run at full speed, 13½ to 14 knots, for about three minutes; that she was then slowed, upon entering the fog bank. Her course from the Red Buoy was not on the line of the dredged channel, but to the eastward of its easterly line, cutting off the corner at the bend of the dredged channel, marked by Black Buoy 1A. She was slowed just before re-entering the dredged channel, and cut across diagonally, making her final turn to N. ¼ W. a few seconds before the collision, well over on its westerly edge. Apparently she was cutting diagonally across the path of descending vessels for a minute and a half, or more, before making the final turn, so far to the west that it brought her a little on the starboard bow of the Providence. That the Georgia passed to the west of the Providence is significant of the extent to which she had overrun. Her fault was that, when she entered the fog bank so near the easterly edge of the channel, she did not seasonably port her helm and keep out of the accustomed path of descending vessels. The Vanderbilt, 6 Wall. 225, 229, 230, 18 L. Ed. 823; The Yarmouth (D. C.) 100 Fed. 667.

While it is urged that the Providence had plenty of water to the west of the black channel buoy, and should have gone there, I am unable to say that the Providence was at fault in taking the usual course, designated by marks, provided as aids to navigation for descending vessels. It is also true that there was good water for the Georgia eastward of the easterly line of the channel. The Georgia was not justified in crowding descending vessels out of the course marked by the buoys, even if it be conceded that a more prudent course for outgoing small vessels and for boats would be in the water to the west of the black buoys.

In the present case the Georgia, which slowed her engines from full speed only about two minutes before collision, could hardly have lost herself in that brief time, or have been prevented from keeping in her own water in obedience to article 25 of the Inland Rules. That it was not safe and practicable for the Georgia to do so has not been shown.

Granting that Capt. Beetle of the Providence erred in relying upon the Georgia's ability to keep her own place in the channel, and in failing to stop his engines, this in no way contributed to the Georgia's being on the wrong side of the channel. I see no reason to doubt Capt. Beetle's testimony that he blew his air whistle twice before hearing the Georgia, and that this was before the Georgia blew her whistle.

While the Providence is charged with fault in respect to her signals and to the character of her whistle, I am of the opinion that these charges are not sustained. Had the Georgia, before reaching the easterly edge of the channel, heard and heeded the signals which I find were given by the Providence before the Georgia signaled, she should have been able to keep to her own side of the channel.

For the Georgia it is contended that she received no warning of the presence of the Providence until after making her last turn, a few

seconds before the collision, when a faint whistle was heard and a light seen at about the same time. The evidence from passengers of the Georgia, as well as from the crew of the Providence, who heard several whistles from the Providence, is entitled to the greater weight.

It must be found that the Georgia, being warned by signals of the presence of the Providence, proceeded under one bell, at a speed of not less than 5½ knots, directly in the path of outgoing vessels, in a fog so dense that the seeing distance was less than her own length, which she would cover in less than 30 seconds. It is, of course, impossible for her to maintain the proposition that at this rate of speed, and without a lookout, she would, in less than her own length, have been able to avoid, after sighting it, either a stationary object or a vessel that was being carried with the tide at the rate of 1½ knots over the ground.

The time and space which she gave herself for maneuvering to avoid an object, after she could see it, was, by her own fault, already too short. Assume that it was further shortened by the failure of the Providence to stop her engines, can it be said that the damage to the Providence was to any extent self-inflicted?

In The Umbria, 166 U. S. 404, 419, 420, 421, 17 Sup. Ct. 610, 614 (41 L. Ed. 1053), it is said:

"These rules are intended solely for the prevention of collisions, and if it be clearly apparent that the observance of a certain rule would not have prevented a collision in the particular case, the nonobservance of such rule becomes immaterial," etc.

Counsel for the Providence contends that, in view of the gross fault of the Georgia, any doubts regarding the management of the Providence, or the contribution of her faults, if any, to the collision, should be resolved in her favor. The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Ludvig Holberg, 157 U. S. 60, 71, 15 Sup. Ct. 477, 39 L. Ed. 620; The Victory and The Plymothian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519; The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Great Republic, 23 Wall. 20, 23 L. Ed. 55.

It is also contended that the failure of the Georgia to stand by precludes the claimants from questioning the navigation of the ship which she deserted. Hughes on Admiralty, p. 268; The Hercules, 80 Fed. 998, 26 C. C. A. 301; Boston Towboat Co. v. Winslow, 76 Fed. 595, 22 C. C. A. 327; The Robert Graham Dunn (D. C.) 63 Fed. 167, 70 Fed. 272, 17 C. C. A. 90.

If, as was said in The Victory and Plymothian, 168 U. S. 423, 18 Sup. Ct. 155, 42 L. Ed. 519, "the burden of proof is upon each vessel to establish fault on the part of the other," and if a like burden exists as to the contribution of a proven fault, there would be little difficulty in the present case. The Providence shows faults of the Georgia sufficient by themselves to account for the collision. On the other hand, it is impossible for the Georgia to affirmatively establish the proposition that the collision would not have occurred, but for the fact that the Providence did not stop her engines. But we are met by the fact that the case of the Providence discloses a statutory fault, noncompliance with article 16. We have a collision of presumptions, and a disturb-

ance of the ordinary rules concerning the burden of proof, which were applied before the adoption of the second paragraph of article 16. The question whether a specified act of negligence is a cause of the accident is a question of fact and not of law. Marsden on Collisions (6th Ed.) p. 20. But from a proven statutory fault there arises a presumption of the contribution of this fault to the collision. The Martello, 153 U. S. 64, 74, 14 Sup. Ct. 723, 38 L. Ed. 637; The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148.

I am of the opinion, therefore, that the gross faults of the Georgia do not relieve the Providence of the burden of meeting the presumption against her on the issue of the contribution to the collision of an admitted failure to stop her engines. She relies upon the fact, established by the testimony from the Georgia, that, when the Georgia blew her first fog signal, she was then actually where she belonged on the easterly side of the fairway, and contends that if the master of the Providence had seen her at that instant he would not have been required to stop his engines. It is contended that the position of the Georgia at this time was accurately determined by the master of the Providence, as on her proper course, on the easterly side of the channel; that she was in fact where she ought to have been, and where she was assumed to be.

The inquiry is made:

"Because the Georgia did not maintain her position, is the Providence to be punished?"

It seems to be true that the Georgia's violation of article 25 of the Inland Rules, which required her to keep "to that side of the fairway or mid-channel which lies on the starboard side of that vessel," did not begin until the lapse of a minute or more after her first fog signal.

Had the Georgia been in sight, the Providence would not have been required to stop her engines, but might have relied upon the ability of the Georgia to perform her duty, by taking a course that would have obviated all risk of collision.

It is contended, however, that even under the existing circumstances the Providence was entitled to rely upon the Georgia's performance of her duty, and cases are cited which state the general rule that a vessel is justified in assuming that the other will perform her duty. The Victory, 168 U. S. 410, 426, 18 Sup. Ct. 149, 42 L. Ed. 519; The Servia, 149 U. S. 144, 153, 13 Sup. Ct. 877, 37 L. Ed. 681; The Sagamore, 247 Fed. 743, 751, 159 C. C. A. 601. I am not informed, however, of the existence of any fog case at all similar to the present, in which that assumption has been held to excuse a failure to obey the second paragraph of rule 16.

This case is unusual in its facts. Capt. Beetle says, "I knew where I was, and I knew where it [Georgia] ought to be;" and as matter of fact the Georgia was where she ought to have been when he first heard her. But it was his duty, as far as was possible, to know, or to take precautions to know, her changes of position, and the means of doing that are prescribed by article 16. The Providence should have done all that it was possible for her to do to determine the position of the Georgia, not only upon her first signal, but throughout the period of her approach. It was impossible for her to see the Georgia's last turn

of 2¼ points, when she established the course of N. ¼ W., or thus to determine either that she was on the wrong side of the channel, or what course she was on. Had her engines been stopped, she would still have been in the same predicament.

The fact that the Providence was struck but 6 feet from her stern shows that, had the Georgia been proceeding as slowly through the water as the Providence, the collision would have been avoided, and the effort of the Providence to get out of the way successful.

It may be said, therefore, that, though the Providence did not stop her engines, her speed was such that she could still have avoided the collision, provided the Georgia had been going at the moderate speed required by law. The argument for the Providence on the question of her speed is as follows:

"We find that, during all of the voyage of the Providence from her dock, which she left at 4:15 to 4:20 daylight saving time, until the time of the collision at 5:30 or 5:32, she had an ebb tide, varying from 3 miles to 1½ miles an hour. If the tide be averaged for the distance at 1½ miles per hour, which is certainly moderate, it will be possible to determine quite accurately the actual speed of the Providence.

"The distance from the foot of Grary street to the point of collision, as shown on the chart, was logged off by Mr. Warren G. Baxter, a civil engineer, and found to be 5.2 miles. The best estimate of time that we have for the navigation of the Providence over this distance is approximately from 1 hour and 10 minutes to 1 hour and 15 minutes, namely, from 4:15 or 4:20 (daylight saving time) to 5:30 or 5:31. Assuming that the tide ran at the rate of an average of a knot and a half for 1 hour and 12 minutes, viz. 1.2 hours, the tide would have carried this vessel, without any power whatsoever, 1.8 knots, and if we deduct the 1.8 knots from the actual distance, it leaves 3.4 knots. This was the distance that was overcome in 1.2 hours, or 1 hour and 12 minutes (it was probably longer), by the engines of the Providence, which shows that she was running at 2.8 miles an hour. The engines of the Providence were actually putting her through the water at less than 3 miles an hour, surely, on an ebb tide, not more than sufficient to give this clumsy vessel steerageway, and certainly moderate if she was to proceed at all."

Counsel for the Georgia do not offer computations to show the exact speed of the Georgia. It was under one bell, and not less than 5½ knots through the water, and probably more.

It must also be found that the Providence was guilty of a statutory fault in failing to stop her engines. She cannot be excused on the ground that she had ascertained the position of the Georgia. The Pemaquid (C. C. A. 1st Circuit) 284 Fed. ——, June 6, 1922. It seems to me, however, that the presumption of the contribution of this fault to the collision is overcome by the established facts.

I find as matter of fact that the violation of rule 16 by the Providence in not stopping her engines did not contribute to this collision. This meets and disposes of the presumption against her. Prince v. Eastern Steamship Co., 109 Me. 395, 84 Atl. 894.

The primary faults of the Georgia in navigating on the wrong side of the channel, at excessive speed and without a lookout, and the character of the injury, justify a finding that, regardless of the fault of the Providence, the collision would still have been unavoidable, and that as matter of fact any excess speed of the Providence tended to avert rather than bring about the collision.

I am of the opinion that both in the case 1487 against the Georgia, and in case 1488 against the Hartford & New York Transportation Company, the defendants are liable for full damages.

Draft decrees may be presented accordingly.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes