## THE PRINZ OSKAR.

### (District Court, E. D. Pennsylvania. July 16, 1914.)

### No. 10.

**1. Collision (§ 45*) — Steamer and Schooner Crossing — Faults of Steamer.**

A collision occurred at sea at night between the schooner City of Georgetown and the steamship Prinz Oskar, in which the former was sunk. The evidence showed that her lights were burning and she kept her course and speed. The night was clear, and, seeing that the steamer continued to approach some minutes before the collision, the mate took a torch and cast a light on the schooner's sails to attract attention. The steamer kept her speed of 12 knots until collision, and changed her course only when it was too late to avoid it. Her only lookout was stationed in the crow's nest, 98 feet from the stem and 81 feet above the water. The lookout saw the light cast on the schooner's sails, and twice reported the same, but the officers, who were busy laying the steamer's course for the voyage, paid no attention to it. When they finally saw the schooner's lights, no change of course was made for half a minute. *Held*, that the schooner was not in fault; that the steamship was in fault for failure to keep out of the way, as required by article 20 of the International Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 320 [U. S. Comp. St. 1901, p. 2870]); for failure to have a lookout properly stationed; for failure of the officers to observe a proper degree of attention; and for failure to promptly reverse when the schooner was seen.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. § 45.*]

2. Collision (§ 108*)—Steam and Sailing Vessels—Error in Extremis.

The failure of a sailing vessel to change her course when collision with a steam vessel seems inevitable, if an error, is one in extremis and does not impute fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 225–231; Dec. Dig. § 108.*]

In Admiralty. Suit for collision by Abram J. Slocum, master of the schooner City of Georgetown and as bailee of her cargo, and the International Salt Company, intervening libelant, against the steamship Prinz Oskar. Decree for libelant and intervening libelant.

Howard M. Long, of Philadelphia, Pa., and Blodgett, Jones & Burnham, of Boston, Mass., for libelant.

Henry R. Edmunds, of Philadelphia, Pa., and Haight, Sanford & Smith, of New York City, for respondent.

THOMPSON, District Judge. [1] The schooner City of Georgetown was a four-masted American sailing vessel 168 feet in length, of 506 tons net burden, and at the time of the collision was bound on a voyage from New York City to Savannah, Ga., loaded with a cargo of salt in bulk. The Steamer Prinz Oskar was a German steamer owned by the Hamburg-American Line, 403 feet in length, with a gross tonnage of 6,026 tons, and at the time of the collision was bound on a voyage from Philadelphia to Hamburg, with general cargo and passengers. The schooner had on board a crew of eight men all told, consisting of master, mate, engineer, steward, and four able seamen. On

February 1, 1913, from 8 p. m. to 12 midnight, she was in charge of her master, and was proceeding on her starboard tack, her course being southwest, with the wind blowing from northwest to west northwest. She had her three lower sails, consisting of foresail, mainsail, and mizzensail set, as well as her forestaysail and jib. Shortly after 12 midnight the watch was changed, the captain went below, and the mate took charge. An able seaman was stationed on the extreme forward part of the deck near the stem as lookout, and an able seaman was in the wheelhouse near the stern, at her wheel, steering her in accordance with the orders of the mate. The southwest course was continued upon the starboard tack with the wind blowing in the same direction. The weather was clear, the night dark, with starlight. When in the vicinity of Five Fathom Light ship those on board the schooner observed the masthead lights of a vessel, which afterwards proved to be the Prinz Oskar, proceeding on a course crossing the course of the schooner. Subsequently the red side light or port light of the Prinz Oskar was observed, bearing off the starboard bow of the schooner, and continued to be observed by the schooner and those in charge of her until just before the collision occurred. The schooner held her course, and when it was seen that the steamer continued to approach and was getting near the schooner, the mate of the schooner took an electric torch and cast the light upon the sails of the schooner, with the intention of attracting the steamer's attention to it. The schooner continued to hold her course and speed, the Prinz Oskar held her course without changing or checking her speed, and the vessels collided. The port bow of the steamer and the forward end of the schooner came into contact at right angles, whereby the forward end of the schooner was carried away and a hole made in the plating of the Prinz Oskar, leaving in the steamer both the schooner's anchors. Those on board the schooner took to the boats, and the schooner almost immediately sank.

The principal points of contention in the case are as to whether the schooner was carrying her proper lights, as to whether the steamship had a competent lookout properly placed, and as to whether she had competent officers in charge of the deck attending to their duties. It is claimed on the part of the steamship that the schooner was showing no side lights, although there was due diligence on the part of the steamship to observe lights of approaching vessels, and that the schooner contributed to the collision by her own negligence in that, finding the collision was inevitable, those in charge of her did not port her helm and throw her up to the wind, and did not exhibit a flare-up light. The evidence as to the lights upon the schooner is conflicting. The captain, mate, and lookout all testified that the lights were properly set and brightly burning. The captain testified from his knowledge of the facts when he went below about 12 midnight, the mate, from an examination made shortly prior to the collision, and the lookout, also from his observation just prior to that time. The Prinz Oskar was in charge of her second and third officers, and had a lookout in her crow's nest, and no other lookout, and the quartermaster was at the wheel. According to the testimony of the Prinz Oskar's second officer, the crow's nest was located from 16 to 20 meters (52 to 65 feet) from the bridge and about

30 meters (about 98 feet) from the stem. The crow's nest was 19 to 20 meters (61 to 65 feet) above the deck, and about 35 meters (81 feet) above the water. The captain was in the chartroom, and had instructed the officers upon the bridge to pass one-half mile distant from Five Fathom Light, and to report when the light was directly abeam the vessel. The Prinz Oskar had discharged her pilot shortly before midnight, and her voyage began with the Five Fathom Light. The collision occurred at 12:55. It appears from the evidence that the Five Fathom Light was passed at 12:49 p. m., and at that time the captain came out on the bridge and at the same time the lookout reported a steamer's lights about four points on the starboard bow and these lights were seen by all of the officers in charge. After the light ship came abeam, the captain ordered the course changed two points. This order was communicated through the third officer to the second officer and by him to the engineer whose log shows the beginning of the voyage and the new course at 12:52, just three minutes before the collision. Meanwhile the captain had returned to the chartroom. The duty of the third officer was to put the course on the log for which purpose he would have to go on top of the wheelhouse. About the time of passing the light ship, the lookout saw the flare of the white light on the port bow and reported it to the officers on the bridge. To this report he received no reply. The white light continued for a period, then disappeared for an interval and was again seen by the lookout, who again reported it to the officers, but received no reply. The lookout then saw a green light on the port bow and reported "light on the port bow," and had barely reported the light when the collision occurred. The second officer testifies that he was looking out for lights or vessels and saw nothing until about a minute before the collision, when he saw a dark object ahead, which proved to be the schooner. The third officer was on top of the wheelhouse observing the standard compass. He first saw the dark object about 2 or 2½ points on the port bow of the steamer at a time, which appears to have been about a minute before the collision. He did not make any report of this to the second officer until within 10 seconds of the collision. He then called out that they would not go clear. At the time he saw the vessel he says she was less than a quarter of a mile from the steamer. Just before the collision the captain came up on the bridge, and at that time he and the second and third officers all saw a green light on the schooner. According to the second officer, this did not differ from the green lights ordinarily shown on schooners, and that seemed to be the opinion of the third officer, while to the captain, whose eyes were momentarily blinded by the darkness after the light of the chartroom, the light seemed to be faint. After the third officer called that they would not go clear, the second officer ordered the quartermaster to "hard astarboard," which, according to the method of giving orders upon German vessels, would put the vessel to starboard. The second officer telephoned to the engineer, and both engines were reversed at practically the same time. Up to 12:55, the time of the collision, the steamer's engines were running full speed ahead, and at that time, as appears by the engine room log, both engines were put full speed astern.

It is urged by the respondent that the testimony of the officers of the Prinz Oskar, by reason of their superior position, education, and training should have greater weight than that of the master, mate, and lookout upon the schooner, who not only by reason of their belonging to a different walk in life, but also because of their interest in the outcome of the suit, were less likely to tell the truth. The circumstances are such that there need be no issue of veracity upon the question of the lights upon the schooner. The lookout upon the Prinz Oskar, the captain, and the second and third officers all saw the green light of the schooner immediately before the collision. That the second and third officers of the vessel did not see it before I think is abundantly explained by the fact that their attention for the few minutes prior to the collision was not direced to scanning the water for lights of approaching vessels, but was entirely directed to the, at that time, important subject of laying the course of the vessel for her voyage across the Atlantic. As has been shown, the course was to be laid from a point where the light ship was within one-half mile and abeam of the vessel. This occurred at 12:49, and the course was altered at 12:52, three minutes prior to the collision. The third officer was busy in reporting to the captain, carrying the captain's orders to the second officer and entering the course upon the log and in examining the compass upon the top of the wheelhouse, and the second officer was busy in laying the course and communicating the captain's orders to the helmsman and engineer. Both of these officers were evidently depending upon the lookout to discern and report any objects affecting the vessel's course, but were so engaged in other duties that they did not hear or did not heed the lookout's report of the white lights a few minutes before the accident. There can be no doubt that the light the lookout saw and reported on two occasions within a few minutes was the light of the electric torch used by the mate to apprise the steamer of the schooner's presence. It appears that the green light of the schooner, when it was seen, was approximately 14 or 15 feet above the water, very considerably below the position of the officers upon the bridge and upon the wheelhouse, while the lookout was stationed over 80 feet above the water. While in this position the lights on steamships, which are high above the water, might be readily seen, but the smaller lights of the schooner, being below the line of vision of the lookout, would not be readily observed by him from his station 98 feet from the stem. It seems to have been settled as a matter of nautical practice recognized by the courts that the proper place for a lookout is as far forward and as near the water as possible, and the importance of having a competent lookout properly stationed has been repeatedly maintained. The evidence seems to be conclusive that the schooner did carry proper lights, and that, if the lookout had been in a position at the forecastle head, he could have seen the lights or observed the approach of the schooner in time to avoid the collision. The truthfulness of the officers of the Prinz Oskar is not impugned, but it is apparent that, on account of their being engrossed in laying the course by the position of the Five Fathom Light at that immediate time, they did not give sufficient attention to approaching objects, and, relying entirely upon the lookout to warn them, they either

did not hear or did not heed his report of the white light, owing to diversion of their attention. When the schooner was seen by the two officers in charge, taking into consideration her speed of 12 knots an hour, there was a remarkable lack of promptness in stopping the course of the vessel. The third officer did not directly report the sail to the second officer at all, but, after a full half minute had elapsed, expressed a doubt that they would go clear, thus indicating that he was willing to take a risk before taking action. Meanwhile the Prinz Oskar was proceeding at full speed.

[2] In the failure of the Prinz Oskar to keep out of the way of the City of Georgetown, article 20 of the International Sailing Rules was clearly disobeyed, and there are no circumstances to hold the schooner in fault for keeping her course and speed. The mate of the schooner was justified in relying upon the steamer to alter her course and pass under the stern of the schooner. While putting the schooner to starboard at the last moment might have avoided the collision, yet if at the same time the Prinz Oskar had attempted to port, the schooner would have been struck amidships. While some of the cases hold that obstinacy in keeping the course of a sailing vessel, where it is appreciated that a collision is inevitable, is evidence of fault on her part, yet the majority of the cases cited by counsel for the steamship merely hold that a failure to keep her course and speed when, in the sound judgment of the master of the sailing vessel, a collision is inevitable, is an error in extremis which does not impute fault.

Under the circumstances, as developed by the evidence, the steamship is clearly in fault for failure to observe Sailing Rule 20 by keeping out of the way of the schooner; for failure to have a competent lookout properly stationed; for failure on the part of the officers in charge of the Prinz Oskar to observe that degree of attention which would have apprised them of the presence of the schooner, and for failure to act promptly in reversing the engines when the collision might have been avoided.

A decree will be entered in favor of the libelant, and intervening libelant.