## THE PRINZ OSKAR.

(Circuit Court of Appeals, Third Circuit. January 8, 1915.)

No. 1882.

1. COLLISION ☞43—STEAM AND SAILING VESSELS—GENERAL DUTY OF CARE.
    It is the duty of a steamship, passing out by the Delaware Capes at night, and crossing the path of coastwise vessels, many of which are sailing vessels, to take every precaution for safety, and an important part of that duty is to maintain a lookout as far forward and as near the water as possible to note the lights of crossing vessels and avoid them, while it is the duty of a sailing vessel to show her lights and keep her course.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 43–47; Dec. Dig. ☞43.]

2. COLLISION ☞49—STEAMSHIP AND CROSSING SCHOONER—IMPROPER LOOK-OUT.
    A decree finding a steamship, passing out of the Delaware at night, solely in fault for a collision with a coastwise schooner, *held* sustained by the evidence, which showed that the schooner's lights were burning brightly, and that she kept her course, while the lights were not seen from the steamship in time to avoid collision through inattention and the fact that she had no lookout forward.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 55; Dec. Dig. ☞49.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit for collision by Abram J. Slocum, master of the schooner City of Georgetown, in which the International Salt Company intervened, against the steamship Prinz Oskar. Decree for libelants, and claimant appeals. Affirmed.

For opinion below, see 216 Fed. 233.

H. R. Edmunds, of Philadelphia, Pa., and Haight, Sandford & Smith and John W. Griffin, all of New York City, for appellant.

Howard M. Long, of Philadelphia, Pa., and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for appellee.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. This is an appeal by the steamship Prinz Oskar from a decree of the District Court adjudging her at fault in sinking the schooner City of Georgetown, and awarding damages against the Oskar to the owners of the schooner. The opinion of that court is reported at 216 Fed. 233. By reference thereto, descriptions of the vessels, their courses, weather conditions, and other pertinent matters will be as satisfactorily seen as though here repeated. We have carefully re-examined the case and find no error in the decree below. Instead, therefore, of restating in other language what has been so fully set forth in the opinion referred to, we limit ourselves to briefly stating such general matters as we deem pertinent.

[1] The collision took place near the Five Fathom Bank Light, which is the point at the south end of New Jersey where ocean-bound vessels coming out of the Delaware cross the much-traveled path of coastwise vessels going north and south. As large numbers of the vessels following this coast-line path are sailing vessels, and as rule 20 makes it the duty of steamers to give way to them, it is evident the situation is one that calls upon steamers, crossing this known path, to take every precaution that tends to safety. The general duty of the sailing vessel is to show her lights and hold her course, and the general duty of the steamer crossing her path is to note such lights and avoid them.

[2] The night in question was clear and the conditions so favorable that the collision could not have occurred if, first, the schooner's lights were burning properly, and, second, if the steamer acted on such lights. In such case, if the schooner's lights were burning, and she kept her course, she complied with the rule and was without fault. The first inquiry, therefore, is: Were the schooner's lights set and burning? The City of Georgetown was a substantial, four-masted schooner of 500 tons. Her sails were handled by steam, and she had a crew of eight men, consisting of her master, mate, engineer, steward, and four able seamen. She had a cargo of salt and had about four feet of free board amidship. The collision occurred at 12:55 a. m. The master of the schooner, a man of many years' experience as a master mariner, was on the watch from 8 to 20 minutes after 12, just preceding the collision. With him on watch were the engineer and two seamen.

The testimony of Slocum, the master, was that the lights were set and burning; that they were the regular standard lights; that they had been used on the vessel for some years and had never given any trouble; that he went forward and examined them that night, at 12:10 a. m., just before he left the deck; that during the watch the lookout also reported the lights to him. At 12:20 the master went below, leaving Johnson, the mate, in charge. The course, to which the mate's attention was then called, was southwest. At this time the Oskar was not in sight.

Petersen, the engineer, was on watch with the mate. He testified: That it was his duty to take care of the lights; that he had himself

gotten them ready that night, had trimmed and lighted them, and seen the man put them in place, and that they were filled with oil; that the lights in the two years he had been on the vessel had been satisfactory; that he cleaned the lights the day before, and on the evening of the collision they were thoroughly clean; that at 12 o'clock he went forward and examined the lights before he went off duty, as it was his duty to do; that he found the lookout of his watch, Olsen, had been relieved, and his place taken by the lookout of the next watch; and that the lights were burning all right and even.

Olsen, the lookout on the mate's watch from 10 to 12, was a first-class seaman, and was at the wheel from 8 to 10. He testified he got the lights from the engineer and put them up the night of the collision; that they were burning at 10 o'clock, when he stood lookout, and that, when he left the watch at 12 o'clock, he looked and saw they were burning just as when he had put them on; that he reported to the lookout who followed him that the lights were burning right.

Johnson, the mate, relieved the captain at 12 and got from him directions to steer southwest. He testified he sighted the Oskar's lights several miles away; that when she was a mile and a half or two miles away, and coming for the schooner, he went forward to the lookout's post and looked to see whether the schooner's lights were right, and found they were burning brightly.

Antonio Malmberg, a first-class seaman, came on deck at 12 o'clock and was lookout from then until the collision. He testifies that, as soon as he came on watch, he looked at the schooner's lights, and that they were burning brightly; that they were burning brightly from then on, and that he looked at them as he was leaving the forecastle just before the collision, and they were burning brightly; that the mate came to the forecastle just before the collision to see if the lights were all right; that they both looked at the lights then, and they were in first-class condition.

The testimony of these witnesses that the green light was burning is corroborated by the captain of the Oskar. He had returned to the chartroom after giving directions for setting the steamer's course for the ocean trip, when he heard the order to shift the wheel by which the Oskar attempted to avoid the collision. We quote his testimony:

"Q. Now, just go ahead and tell what happened from then on. A. Then I heard the order given to hard astarboard the wheel. Q. Where were you at the time that order was given? A. I was in the chartroom. Q. Then what happened? A. Then I heard the engine telegraph rung up, and then I ran out. Q. Where did you go? A. I went right out on the bridge. Q. Did you see the second officer there then? A. Yes, sir; but the third officer was on top of the wheel house. Q. What, if anything, did you see when you got out there? A. Well, of course, as I came from a lighted place right out to where it was dark, I could not see anything at first, but then, as soon as I got my bearings, I would make out this schooner. Q. How long was it after you got out before you made out the schooner? A. That could not have been more than a second. Q. In what position was this schooner at the time that you then saw it? A. That schooner was then at right angles to our boat. Q. That was at right angles to the course that you were upon? A. Yes, sir; she was just about at right angles to our course. That is the way that it appeared to me. Of course I could not get the exact angle, but that was just about it. Q. When you saw the schooner at that time, were the vessels almost

in collision? A. It was apparent that there was going to be a collision, but they did not strike right away. Q. How soon did they strike? A. It was in a few moments after I got out there when the schooner actually hit us. Q. Were you able to see any light on the schooner at that time? A. Yes, sir; I could make out the green light of the schooner. Q. What kind of a light did it appear to you to be? A. It was a very weak light, the way that it was showing then. * * *

"XQ. And it was at that time that the schooner was about at right angles to your course, as near as you could judge? A. Yes, sir. XQ. And the collision was about to happen? A. Yes, sir. XQ. Was it at that time that you saw the green light of the schooner? A. Yes, sir; in a second or two after I got out, because when I first got out I could not see very well on account of coming from the light room into the darkness. * * * XQ. You did not have time enough to examine it? A. No, sir; only to see it and then the collision happened."

The testimony of Luensee, the Oskar's second officer, is:

"Q. Up to the time that the schooner struck, had you seen any light from that vessel? A. Yes, sir; just before. Q. What light did you then see? A. Just before she struck I saw a white light as if a man was carrying it along the deck and running along there. It might have been a lantern he had or some such white light. Q. About how far away was the schooner then? A. I should judge that she was just about a vessel's length away then. Q. Did you see any other light from the schooner at any time before she struck, and, if so, what was it? A. Just before she struck the green light came into view. Q. How did it come into view, that green light I refer to? A. I have an impression that the vessel was turning up into the wind, and that the green light came into view gradually. Q. Just how would you yourself describe that light? A. Well, it had the appearance to me of being a broadening out light. It appeared very small at first, and then got broader and broader, as if the vessel was coming up into the wind, and then suddenly it appeared to be in full view. I could see it plainer each second as I saw it. * * * Q. How long did you say it was before the vessels came together that you saw the green light of the schooner? A. I should judge that it would be about 15 seconds before the vessels actually hit. Of course in the excitement of the collision it would be a very hard matter to estimate the time. * * *

"XQ. You saw this light, didn't you? A. Yes, sir; just before the collision. XQ. Well, you had a pretty good look at it then? A. True. XQ. And it looked like a pretty good strong light to you? A. It looked strong enough when I got a good look at it. XQ. You did not see any imperfection in that light, did you? A. Not that I could make out in the time that I saw it. XQ. And there was nothing which you could find wrong with it? A. No, sir; not as far as I could see, there was not."

The testimony of the third officer, Zarn, as to the green light, was:

"Q. How long before the collision was it when you were able to make out that green light? A. I should judge that it was not more than ten seconds before the vessels were into each other when I saw that green light. Q. Had you been able to see anything of that green light before that? A. No, sir; she had not been showing it to us before that. Q. If that green light had been showing to you, could you have been able to have seen it before you did? A. Yes, sir; if that green light had been where I could see it plain, I would have been able to see it all right all of the time. Q. At the time that you first made out the green light, how did it show to you; how did you see it, I mean? A. The first I could see of it, it appeared very little to me. Q. Do you mean by that, that it did not show up well to you? A. No, sir; at first I could hardly see it, and then it began to get brighter. Q. How did it finally appear to you? A. Then in a short time I could see it plainer; but at first only at a small angle. Q. Then, afterwards, as I understand, you saw it broad? A. Yes, sir; finally I was able to see the light all right. * * *

"XQ. What kind of a light did this seem to you when you saw it? A. It did not seem to me as if it was a very good light. XQ. Would you call it a poor light? A. I would call it a weak light. XQ. What was the matter with the light? What do you complain about it? A. I don't know what the matter was. I could not tell. XQ. Do you know whether there was anything the matter with it at all? A. I could not tell what was the matter with that light, but I know that it looked to me as if it was not a good light. XQ. Of course, you can't say that there was anything the matter with that light or not? A. No. sir; not for certain, I could not. * * *

"RXQ. You said that you saw the green light of the schooner just before the collision? A. Yes, sir; that was just a few seconds before the collision happened that I saw that. RXQ. Did it look the same as the ordinary side lights of a schooner when you saw it then? A. Yes, sir; because it was very close to us. RXQ. It looked just the same as the lights on other vessels? A. Yes, sir; when I got very close to it, it did."

Hansen, the steamer's lookout on the crow's nest, said as to the lights on the City of Georgetown, as follows:

"The second report I made was a weak white light on the port bow. That was about a point and a half on our port bow, and was about in line with the Lightship when I first saw it. I thought then that it was a light belonging to the Lightship, in the cabin or something like that, but as we went on, I saw that it moved clear of the Lightship, and then I reported it. I heard no answer to that report. I heard no answer to my first report either. The third report that I made was when I saw the sails. I called out then, 'Light on the port bow.' This was a weak green light. I thought it was some little distance away first, but it proved to be close to. I saw the green light and turned around to report, and when I had turned around we had struck. First, I saw the loom of the sails, and then I looked sharp and saw a very weak green light, and then I turned to report."

It will thus be seen that all these witnesses agree on the fact that the schooner's green light was burning just before the collision, and the difference between them and the schooner's witnesses is as to the light being then weak or otherwise. The steamer's people all say that no green light was visible until just before the collision; and from the fact that some one was seen hurriedly running forward with a light just prior to the collision, we are asked to infer that the green light was then lighted. This contention does not commend itself to us. One fact stands out clearly in the testimony, and that is that the schooner twice showed an electric light. By the schooner's men, this was when she was two miles distant from the steamer; by the steamer's lookout, it was six or seven minutes before the collision:

"Q. The white light that you say you saw six or seven minutes before the collision on your port bow, did that light remain in view from the time you first reported it up to the collision? A. No. Q. What became of it? A. It became weaker and it vanished altogether. It came into sight again, very weak, just like a gas buoy that is rising and falling on the water."

It being thus established the white light was twice shown, we are warranted in finding it was shown because the schooner's watch was apprehensive the steamer did not see her lights. Such being the case, added weight is given to the testimony of the schooner's men that the green and red lights were then looked at to see if they were right. Taking the testimony as a whole, we are of opinion its weight shows the schooner's lights were in good order and burning brightly, and that she properly kept to her course. The court below was of opinion that

the failure of the officers of the steamer to note the schooner's lights was due to their being then intent on the very important work of laying their course across the Atlantic. That there was inattention on the part of the steamer is clear. Hansen, the lookout, reported the white light from the port side as it came out from the line of the Lightship. He reported the light, but got no reply from the bridge that his report was heard. He admits he got no answer showing his report was received, but he neither repeated his report or made a second report when he saw it again. To this evidence of inefficient work may be added the fact that those on the bridge, when they looked, may have had their attention centered on the lights of the Lightship, just as was the case with the lookout, and thereby failed to catch the schooner's green light. Neither of the officers saw the flares of the schooner's electric light, which were seen by the lookout. The failure of these two officers to see such a light correspondingly weakens their testimony that they were intent on discovering lights. If they were alert and could have seen the green light, why did they not see the twice shown electric light, which the schooner's people say they made and the lookout says he saw? To this may be added the steamer's grave omission, as then situate, to have a lookout as far forward and as near the water as possible. She was coming at speed out of inland waters. She had not passed the Five Fathom Lightship, and was about to cross the intersecting pathway of the coastwise trade. In her course she was likely to meet the low-lying sailing vessels that traveled the coast. We cannot too strongly emphasize the imperative duty of swiftly moving, tall steamers to take every possible precaution to avoid collision with low-lying sailing vessels. Amongst those precautions courts experienced in maritime affairs have recognized that of placing the lookout as low and as far forward as possible. It suffices from the cases to which reference might be made (Chamberlain v. Ward, 62 U. S. 548; [1] The Ottawa, 70 U. S. 268 [2]) to refer only to that of Eastern Dredging Co. v. Winnisimmet Co., 162 Fed. 860, 89 C. C. A. 550, which fairly summarizes them as follows:

"The Supreme Court has been constantly rigid in holding vessels to maintaining lookouts as far forward and as near the water as possible. Especially where the water is dark, with otherwise a fairly clear night, it is important that the lookout should be as near it as possible, in order that his eye may follow the surface, and thus be in position to detect anything low down which may be approaching."

Viewing the case as we do, we find no fault on the part of the schooner. With her lights duly set and burning, it was her duty to hold her course. She saw the steamer's lights, and she had a right to assume the steamer saw hers. She took the additional precaution of throwing an electric light on her sails, in order that she might intensify what her lights showed, namely, that her course was bearing towards the steamer. It is urged she was at fault for not burning a torch. But what effect that would have had is wholly speculative. The vessels were two miles apart; the electric light was flashed on the sails; the schooner had every reason to think that light would be seen. It was seen and was ineffectively reported, and its presence had absolutely no effect on those controlling the steamer. There was still time for the

[1] 16 L. Ed. 211.　[2] 18 L. Ed. 165.

steamer to have acted, but the light was ignored. With this indifference shown to the light that was twice shown, it would be highly speculative for this court to now hold the showing of a torch by the schooner would have averted this collision.

Without entering into further discussion, we are satisfied the cause was rightly decided by the court below, and its decree must be affirmed.