## BRINDLE v. THE EAGLE.

(First Division. Juneau. March 27, 1922.)

**1. Collision ⬰77—Admiralty—Lookout.**

The failure to keep a lookout is a violation of the general rule to prevent collisions between vessels, and nothing can exonerate a vessel from such failure, unless it should appear that the collision would have occurred notwithstanding such failure. The proper place for such lookout is such a position as will afford a view over the bow of the vessel, where the best opportunity is afforded for observation of approaching vessels. This rule is undoubtedly as applicable to the boats of the motor class as to ocean steam vessels.

**2. Collision ⬰77—Gross Negligence of Vessel at Fault.**

Where the vessel at fault was running on a clear night at full speed ahead, without lights, and, when near to another vessel with lights, suddenly turned toward and struck and damaged the other vessel, *held*, guilty of gross and inexcusable fault, and the court refused to divide the damages, but assessed full damages against the vessel at fault.

**3. Collision ⬰14—Shipping—Admiralty.**

The Wildwood was a motorboat of class 3, of 13 tons burden, and about 43 feet long. At the time of her collision with another boat she was not carrying passengers. It was contended that the Wildwood was in fault because, at the time of the collision, the master of the Wildwood, though having a certificate as master, was not 21 years of age, and therefore not qualified to act as such. *Held*, the age of the master of the Wildwood cannot be material. She was not carrying passengers, and no fault is attributable to his acts as master at the time of the collision. He had a certificate as master, and the owner of the Wildwood was justified in relying upon that certificate.

On July 23, 1921, a collision occurred in the waters of Revillagigedo Channel, off Mary Island, in the waters of the territory of Alaska, between the gas boat Eagle and the gas boat Wildwood, in which the Wildwood was damaged. Alexander Brindle the owner of the Wildwood, libeled the Eagle on August 25, 1921, alleging that the collision occurred through the sole fault of the Eagle, and on September 10, 1921, Steve Selig appeared and filed his claim to the gas boat Eagle and answer to the libel. Pursuant to stipulation of proctors on either side, an amended answer to the libel was filed by the

⬰See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

claimant on December 17, 1921, denying all the material allegations of the libel, and averring that responsibility for the collision lay with the gas boat Wildwood. On January 19, 1922, at the beginning of the hearing, an amended libel was filed by the libelant, under stipulation of proctors for the respective parties, in which it was alleged that the collision was the fault of the Eagle, in that she carried no lights, and did not exhibit any lights until within about 60 feet distant from the Wildwood. Testimony was taken before the court on January 19, 20, and 21, 1922, and the case continued until February 20, 1922, for the submission of certain depositions on behalf of the claimant.

Charles H. Cosgrove, of Ketchikan, for libelant.

Winter S. Martin, of Seattle, Wash., for claimant and respondent.

REED, District Judge. The uncontradicted testimony shows that on the night of July 23, 1921, the gas boat Wildwood, being of 13 tons gross measurement and of a length of 45 feet, was proceeding in a southerly direction on a voyage from Ketchikan, Alaska, to Prince Rupert, British Columbia, loaded with a cargo of fresh fish; that her crew consisted of one Leo F. Ryan, as master, and Harold Brindle, as engineer. The weather was good, the sea calm, and the night clear and bright, as the moon was nearly full and only occasionally obscured by clouds. The testimony of Ryan, the master of the Wildwood, is to the effect that, when opposite Mary Island light, at about the hour of 10:20 p. m., he observed, at a distance of from 100 to 125 feet, off the port bow, a black object, which he took to be a log, but that almost immediately thereafter lights were flashed on, showing the masthead and the two side lights of a boat which he afterwards found to be the gas boat Eagle; that on observing the lights he immediately put the helm hard to port to sheer off to starboard; that the on-coming boat also turned in the same direction and struck the Wildwood on the port quarter, about 8 feet from the stern, causing the damage complained of.

The Eagle was in charge of the claimant, Selig, who, some 20 minutes before the collision, had gone between-decks, preparatory to retiring. He left, as helmsman, one Al. Ames, and also one Olander in the pilot house, and the only testimony

on the part of the claimant as to the facts leading up to the collision was that of Ames. It seems that the testimony of Mr. Olander, who was with Ames in the pilot house of the Eagle, could have been procured by the claimant, as his whereabouts was known until six weeks prior to the time of the hearing, but was not produced at the hearing, and his (Olander's) testimony is entirely lacking, although it would have been very material.

Ames testified that he was a deckhand on the Eagle; that he had worked on different boats—three or four days all put together; that he was at the wheel of the Eagle at the time of the collision, and Olander "was there; just around there." He "guessed he was on lookout." Selig was down in the engine room, according to the testimony, and he turned the lights on, on the Eagle, about 20 minutes before the collision, when Ames took the wheel. The Wildwood was 50 or 60 feet away when he first observed her. He thought he saw one white light, which was dim, about 7 or 8 feet above deck. When he saw the Wildwood, he put the wheel hard aport, turning his boat to the right, or starboard. When he saw the Wildwood, she was two points off the starboard bow. Taking the testimony of these two witnesses as to the position of the two boats just prior to the collision, it would appear that the Wildwood had the right of way, as the position of the Eagle from the Wildwood was approximately two points off the port bow of the Wildwood, and the position of the Wildwood from the pilot house of the Eagle was two points off the starboard bow of the Eagle.

According to this testimony, both boats turned to the starboard—the Wildwood toward the Mary Island shore, lying to the westward, and the Eagle to the eastward, toward the open channel. I, however, cannot come to the conclusion that the Eagle turned to the starboard, or toward the open channel. According to the undisputed testimony, the Wildwood was struck on her port quarter about 8 feet from the stern, smashing her timbers and cutting her down below the water line, and if the Eagle had promptly put her helm to port, she would have cleared the Wildwood, or at least struck her only a glancing blow. In confirmation of this conclusion is the testimony of the two witnesses, David Kinyon and his wife, who had a plain view of the collision from the shore of Mary

Island. These witnesses were the assistant lighthouse keeper and his wife, and both gave a clear, detailed, unbiased account of the accident, and their testimony is entitled to the highest credit. Mrs. Kinyon, wife of the assistant keeper of the lighthouse, stated that she, on the evening of July 23d, at about 10 o'clock, saw a white light proceeding south, and, thinking it the mail boat, watched it. She first saw it about a mile away, the weather being fine and apparently clear. There was a moon at times, and it was quite light. As she entered the porch of her house, she saw a green light, and from the arrangement knew it was not the mail·boat which she was expecting. After that she and her husband heard the exhaust of another boat, coming from a southerly direction, and looked for its lights, but could not see any, though they could hear the exhaust distinctly, and she could distinctly see the lights on the south-bound boat. On the north-bound boat she could see no light, but could hear the exhaust distinctly. Yet the north-bound boat was traveling at full speed. She observed the boats for many minutes, because she considered that they were headed for each other and she expected a collision. A few minutes before the collision, the north-bound boat flashed on her lights, and, when she struck, Mrs. Kinyon observed three lights—a red light, a green light, and a white light on the north-bound boat. She said:

"It seemed to me that the helmsman, just momentarily, before they struck, must have directed his course directly toward us. It seems to me that he threw his boat to the port. As to the south-bound boat, I could only see the white light, because the green light had been shut out; she being south of us. But I.seen the green light and the white light prior to that time."

When they collided, they were from the shore, from the beach, not over 500 feet. On her cross-examination, Mrs. Kinyon testified that the south-bound boat was closer in to shore than the north-bound boat, and that the collision occurred about 700 feet from where she was standing on the shore, and further, on redirect examination, she testified that the interval between the flashing on of the lights on the north-bound boat and the collision was not more than five seconds— that "it was such a short time there was no time for thinking."

David Kinyon, the assistant lighthouse keeper, corroborated his wife in every particular as to there being no lights on

the north-bound boat. He picked her up with glasses, and observed her for about four minutes, and saw her flash on the lights not more than two seconds before the collision. On cross-examination he said he first saw a red and white light, and then, two seconds later, saw the green light, when she turned towards the shore, and said:

"She headed toward shore and came around quick."

From this testimony, which so clearly detailed the circumstances of the collision, I can come to no other conclusion than that the north-bound boat—that is, the Eagle—was traveling at full speed without lights, at any rate up to within a very few seconds of the moment of collision. The lighthouse keeper says two seconds; his wife says five or six, but that she could not estimate the interval, because it was so short there was not time to think.

The testimony of Ames is to the effect that he first saw the Wildwood when she was 50 or 60 feet off—a distance which, if the boats were traveling at their ordinary speeds, it would have taken them about two seconds to cover. As to the position of the boats, especially from Mrs. Kinyon's testimony, it appears that the Eagle was the farther offshore, which corroborates to some extent the testimony of Ryan, the master of the Wildwood, and Ames on the Eagle, that they were approaching on an angle; the Wildwood being two points off the starboard bow of the Eagle, and the Eagle two points off the port bow of the Wildwood. I am therefore satisfied from the testimony that the Eagle did not port her helm and turn to the starboard, as testified by Ames, but that she either kept on her course or turned to port, or inshore, toward Mary Island, as testified to by Ryan and by Mr. and Mrs. Kinyon. If the Eagle had turned to the starboard, she would have cleared the Wildwood, or at least have struck her only a glancing blow, and the testimony shows that the impact was almost direct, tending slightly toward the stern of the Wildwood.

I can therefore come to no other conclusion than that the proximate cause of the collision was the negligence of the Eagle, first, in traveling after nightfall without lights, and, second, in not turning to the starboard on discovery of the Wildwood. The proctor for the claimant, in his very able

and comprehensive brief, contends that the Wildwood was also at fault, in that there was no lookout on the Wildwood) other than the helmsman in the pilot house; that the master of the Wildwood, though having a certificate, was not 21 years of age, and therefore not qualified to act as such, and that, when he first discovered the Eagle approaching, he was at fault in not signaling as to passing, and therefore that the damage should be divided.

I am of the opinion, however, that these three contentions cannot be sustained in this case. The helmsman of the Wildwood first discovered the Eagle at a distance of from 100 to 125 feet as a dark object, which he could not identify as a vessel. In space of time, this could have been only four or five seconds, at the most, before the collision. When the lights were flashed on the Eagle, at the most four seconds only, perhaps less, ensued, before the collision, and there was no opportunity to give him the signal. The right of way was with the Wildwood. The approaching vessel was off the port bow, apparently head on, and the obvious thing for the helmsman of the Wildwood to do was to immediately turn her to the starboard, and, in a case of extreme danger like this, the omission to signal cannot be considered a fault.

The question of the age of the master of the Wildwood cannot be material. The Wildwood was a motorboat of class 3, of 13 tons burden, and about 43 feet in length, and is subject only to the regulations of section 4412, Revised Statutes (U. S. Comp. St. § 8166), as to the passing of vessels, and sections 4233 (U. S. Comp. St. §§ 7942–7968) and 4234, relative to lights, etc.; also only while carrying passengers for hire, she is required to be in charge of a person duly licensed for such service. See Act of June 9, 1910, § 5 (U. S. Comp. St. § 8281). It was not necessary, at the time of the accident, that the Wildwood should have been in charge of a licensed master, for she was not, at that time, carrying passengers. Moreover, whether it was necessary or not, the master of the Wildwood had received his license as such, presumably on the authority of the local inspectors, and the owner of the Wildwood was justified in relying upon that certificate.

Again, I can discover no negligence or incompetency on the part of the master of the Wildwood after the first discovery of the approach of the Eagle. He acted promptly, and did

the necessary and obvious thing by sheering off to starboard. The contention of the claimant on this point cannot be allowed.

The third and most serious contention of the respondent is the lack of a lookout, other than the helmsman of the Wildwood. It is a rule that all vessels should have a lookout other than the helmsman, and this lookout should be stationed at the bow of the boat, where he can have free and untrammeled vision over the water. This rule is undoubtedly as applicable to the boats of the motor class as to ocean steam vessels. The Noe G, 235 Fed. 119, 148 C. C. A. 613.

The failure to keep a lookout is a violation of the general rule to prevent collisions between vessels, and nothing can exonerate a vessel from such failure, unless it should appear that the collision would have occurred notwithstanding such failure. The proper place for such a lookout is such a position as will afford a view over the bow of the vessel, where the best opportunity is afforded for observation of approaching vessels. See The Prinz Oskar, 219 Fed. 483, 135 C. C. A. 195; The Sagamore, 247 Fed. 743, 159 C. C. A. 601; Eastern Dredging Co. v. Winnisimmet Co., 162 Fed. 860, 89 C. C. A. 550.

The pilot house is not the proper place for a lookout, except under such circumstances that it is the only safe place. See The Tillicum, 230 Fed. 415, 144 C. C. A. 557; The Ottawa, 3 Wall. 269, 18 L. Ed. 165. However, looking at the situation of the two boats, as I find them to have been at the time of the collision, I am inclined to believe that the lack of a proper lookout on the Wildwood was not a contributory cause of the collision. It appears from the testimony that Ryan, master of the Wildwood, saw a black object, which he thought to be a log, about two points off the starboard bow. Mrs. Kinyon also testified that just prior to the collision she saw a black object, which she was unable to identify, but considered it to be a log just prior to the time of the accident. If it were, as Ryan supposed, a log which he saw, he, by keeping on his course, would have avoided it; but, when the lights of the Eagle were flashed on, it was too late to avoid a collision. The proximate cause of the collision was the lack of lights on the Eagle up to a time when too late to avoid the collision. If the lights had been on the Eagle at the time

when Ryan, the master of the Wildwood, first saw the black object, the collision would have been avoided.

Again, it appears that the Eagle was observed by the master of the Wildwood at least two or three seconds before the Wildwood was observed by the helmsman of the Eagle, or the lookout, Olander, who was in the pilot house of the Eagle. This, although the Wildwood had all her lights burning. Thus there can be no comparison as to the vigilance or competency of the lookouts on the two vessels. If, as required by the regulations, the lights on the Eagle had been lit, and the lookout, instead of being in the pilot house, had been at the bow of the boat, tending to his duties, a collision would probably have been avoided. Where there has been gross fault shown on the part of one vessel, it is incumbent on that vessel to show, by clear testimony, a contributing fault on the part of the other vessel. This, under the circumstances of the case, I do not think that the respondent has done. It is also well settled that, if a collision is not shown to have resulted because of neglect to keep a proper lookout, the vessel should not be made responsible on that point for the consequences of the collision. See The Bluejacket, 144 U. S. 372, 12 Sup. Ct. 711, 36 L. Ed. 469; The New York Cent. No. 22, 135 Fed. 1021, 68 C. C. A. 661.

It further appears from the testimony that the fault on the part of the Eagle is so gross and inexcusable that any question of a contributing fault on the part of the Wildwood should be resolved in her favor, and I therefore must decline to divide the damages arising from the collision.

As to the amount of the damages to which the Wildwood is entitled and the cost of repairs to the hull, there is a wide variance in the testimony. The testimony shows that the hull of the Wildwood was built in 1906, and that her construction was not balanced, she being weak in the after part. The libelant states that the hull lay for some years under water, and that he purchased the hull in that situation for the sum of $350; that he raised and repaired it at a total cost of $1,300; that the engine cost him $1,200, exclusive of repairs, and that the total value of the boat and equipment at the time of the collision was $3,500. It appears that the hull was in good condition, except for minor faults in construction, criticized by the ship carpenters making estimates of the cost of repairs.

The cost of repairs was estimated by expert witnesses at from $500 to $1,328, and it is very difficult to reconcile this wide discrepancy, depending as it does so much on the view of the several ship carpenters as to what was necessary to place the hull in its former condition. All the carpenters testified that it was very questionable whether the hull was worth repairing. Inman, a witness for the libelant, to whom the libelant submitted the cost of repairs immediately after the accident, seems to have made the most complete examination of the hull, and he expresses his conviction that the repairs would cost $1,328. Other witnesses, on behalf of the respondent, vary from $500 to $1,000 in their estimates.

A review of the whole testimony leads me to believe that the hull could be repaired at less cost than Mr. Inman testified to, but that it would be much more expensive than testified to by respondent's witnesses. In my judgment, a fair estimate of the cost of repairs, including the replacement of the keel, would be $1,050, and that amount should be allowed against the Eagle for repairs to the hull of the Wildwood. The cargo loss amounts to the sum of $294.30, and this amount should be allowed. Replacement of the batteries, electrical equipment, boat, and other supplies and equipment should be allowed in the sum of $222.50, being two-thirds of the estimated cost price of the articles lost, on the principle adopted by insurance companies in supplying new material for old material lost, as the nearest approximation possible at the time of the collision. For reconditioning the engine and a new shaft, instead of the old shaft, which was bent, there should be allowed the sum of $200, which is estimated as the amount necessary to place the engine in condition. For demurrage, or loss of the use of the boat, an amount should be allowed, but only for the time requisite to make necessary repairs. The estimates as to the time for the repairs of the boat given by the experts vary, but a reasonable time for the repairs from the date of the collision, including the replacement of the electrical equipment, would be not over 4 weeks from the time of the accident. It appears that the boat was under charter or hire to one Harold Brindle, who was engaged in buying fish and transporting them to Prince Rupert, Canada, for sale. He testified that the collision occurred in the midst of the fishing season, and that the reasonable profits derived

from the business in which the boat was engaged under his management during the balance of the season, would have been from $1,500 to $2,000, and that the boat's percentage of this would be one-third. Therefore, during the season the boat would have earned approximately $500, the season lasting approximately 60 days, and during the 4 weeks which the boat would have been out of commission as a result of the accident, the earnings would have been approximately $240. I therefore consider that $240 is a reasonable sum to allow for demurrage or loss of the use of the boat until the time she could again be put in commission, which sum will be allowed, making a total allowance of $2,006.80, which sum is the total damage to the Wildwood and cargo by reason of the collision.

Let findings and decree be prepared in accordance herewith.