## THE COMUS.

## SOUTHERN PAC. CO. v. UNITED STATES.

Circuit Court of Appeals, Second Circuit.
May 9, 1927.

No. 301.

**I. Collision ☞40, 144—Both of vessels on crossing courses held at fault, and liable for loss from collision (International Rules, arts. 22, 23, 28 [Comp. St. §§ 7861, 7862, 7867]).**

Both of vessels on crossing courses *held* at fault in collision, one for violation of International Rules, arts. 22, 23 (Comp. St. §§ 7861, 7862), the other for violation of article 28 (Comp. St. § 7867), and jointly liable for loss.

**2. Collision** ⊗⟞130—**United States** ⊗⟞110—**In libel by United States and cross-libel, United States was entitled to interest on recovery at rate of 6 per cent. though adverse party could recover but 4 per cent. (Suits in Admiralty Act [Comp. St. §§ 1251¼–1251¼l]).**

In libel by the United States and cross-libel by respondent to recover for losses from collision resulting in sinking of Shipping Board vessel, the United States was entitled to interest on its recovery at the rate of 6 per cent., though adverse party was entitled to only 4 per cent. under Suits in Admiralty Act (Comp. St. §§ 1251¼–1251¼l).

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the United States against the steamship Comus, with the Southern Pacific Company as claimant, and a cross-libel filed by the Southern Pacific Company against the United States to recover for losses sustained due to a collision between the steamship Comus and the steamship Lake Frampton on the high seas. From a decree holding both vessels at fault, the United States appeals. Modified.

Charles H. Tuttle and Emory R. Buckner, U. S. Attys., of New York City (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and C. B. Manley O'Kelley, both of New York City, of counsel), for the Comus.

Before MANTON and SWAN, Circuit Judges, and CAMPBELL, District Judge.

MANTON, Circuit Judge. On July 12, 1920, at 3:20 in the morning, with the weather clear, east of the Tucker Beach Light off the New Jersey coast, the Frampton and Comus came into collision, resulting in the sinking of the former and causing the loss of two lives and very serious property damages.

The Frampton was a Shipping Board vessel, and left New York, in ballast, on the afternoon of July 11th, bound for Newport News. She was a steel lake-type vessel, of 2,621 gross tons, 261 feet long, 43 feet beam, and her bridge and engines were amidship. She proceeded down the coast on her usual course; her lights, as required by law, were properly set and burning brightly. After midnight, the second officer was in charge on the bridge, an experienced quartermaster was at the wheel, and a lookout stationed in the eyes of the ship. The quartermaster and the lookout exchanged stations in the middle of the watch. She passed Barnegat Gas Buoy abeam about 1:20 a. m. about five miles off.

At this point the course was altered to 194° true. The stars were shining brightly, but there was no moon. She was making about 10 knots an hour.

The Comus was a steel steamer of 4,828 gross tons, 391.6 feet long, 48.3 feet beam, with a speed of about 16 knots. She was engaged in passenger and freight service between New York and New Orleans, and at the time was on a voyage from New Orleans to New York with passengers and general cargo. Her second officers came on watch at midnight. The deck watch included a bow lookout, a wheelsman, and a messenger. When the watch was changed, the Comus was steering a compass course of N. x E. ¾ E. or north 13° true, diverging 1° from being directly opposite to that of the Frampton. The watch officer said he was navigating by the lights. A fresh breeze was blowing from the south, which was from the Comus toward the Frampton, and the sea was choppy. At 2:45 a. m., the Comus passed Absecon Light abeam about 8 miles from the point of collision. At about 3 o'clock, or 15 minutes before the collision, the second officer saw the range lights of the Frampton, 6 or 7 miles away; the lower and forward light open to his left or westward. When he saw these lights, they were from ¾ to 1½ points on his starboard bow. However, he took no accurate bearings.

[1] At about 3 o'clock by the Frampton's ship time (which was 5 minutes faster than the time of the Comus), the range lights of a steamer were seen by the Frampton on an opposite, but not a meeting course, and were observed slightly on the port bow. These range lights were open to the left or eastward, and indicated that the approaching steamer was on a course to pass clear on the port side of the Frampton. The Comus contends that, if the Frampton had kept her course, she would have passed clear, starboard to starboard, but later the Frampton's range lights seemed to open up, and her red side light was seen. To those on the Comus, it looked as if the Frampton had ported her helm and was attempting to cross the Comus' bow from starboard to port. She had sounded no signal indicating a change of course. The navigator ordered a hard astarboard; attempting to swing the Comus clear. She swung about 1½ points under her starboard helm, but her stem struck the Frampton port side forward of the deck, cutting several feet into her. The blow of the collision pushed the Frampton's bow around, and her left side swung against the Comus' starboard side.

The master of the Frampton said he saw the red light of the Comus and her range

lights open to his left. At this time, the courses of the vessels diverged about one degree. Then the Frampton changed her course 1½ points to starboard, and she was steadied on a course 211° true, which she maintained at the same speed until the collision. At this time the Comus was between 2 and 3 miles away. The master remained on the bridge until he saw that all was well and the Comus' bearing had broadened on the port bow to about three points. He then went into the chart room to plot his new course. A watch officer stayed by the compass, and then walked to the starboard wing of the bridge and saw the Egg Harbor Light, which was yet abeam. He says that about this time the Comus, without a warning signal, shut in her red light, opened up her green, and was heading toward the Frampton's port side at nearly right angles. A few seconds later the Comus collided into the Frampton, striking her with her stem on the port bow near the foremast. At this time both vessels were running full speed ahead. The District Court held the Comus at fault for starboarding her helm, and the Frampton at fault because she was on a crossing course, and changed her heading 2 or 3 miles away without blowing a signal, and because her lookout was inefficient.

Where, on a clear night, two vessels see each other 6 or 7 miles apart, and then come into collision on the wide ocean, there is a heavy burden upon each of them to explain their navigation in an endeavor to exonerate themselves from fault. It is important at the outset to ascertain correctly the courses of the ships and determine whether they were on parallel or crossing courses. The former is claimed by the Frampton, and the latter by the Comus. The Frampton's claim of parallel courses is incredible. If the vessels were on parallel courses, and the Comus bore one point on the Frampton's port bow, 6 miles away, and if the vessels continued at the speed we think they maintained (10 knots by the Frampton and 12 knots by the Comus), maintaining their courses, they would have passed clear port to port about one mile apart. But the Frampton admittedly ported about 17° to starboard, and, if the Comus maintained her course and speed, they would have passed clear but a distance of about 8,100 feet. In that event, no starboard helm movement of the Comus, as testified to by the master of the Frampton, within a distance of a third of a mile, could have caused the Comus to collide with the Frampton. The lateral distance between the two vessels was so great, by the change of course of the Frampton, that the Comus could not possibly have increased her speed so as to bring the vessels in collision. The Cushing (C. C. A.) 292 F. 560; The Coamo (C. C. A.) 280 F. 282.

The vessels were on crossing courses, with the Comus the burdened vessel. On such a course, articles 22, 23, of the International Rules (Comp. St. §§ 7861, 7862) were applicable. Pursuant to article 22, it was the burden of the Comus to keep out of the way of the Frampton and avoid crossing ahead of her. She plainly violated this rule in starboarding her helm as she admittedly did. The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Manitoba, 122 U. S. 97, 7 S. Ct. 1158, 30 L. Ed. 1095; The Free State, 91 U. S. 205, 23 L. Ed. 299. Furthermore, the Comus violated article 23 in failing to slacken her speed or stop or reverse before the collision. No effort was made to reduce the speed, nor to reverse, at any time before the collision, and the explanation for the failure to do so is unsatisfactory. Violations of these rules by the Comus, in part, at least, brought the vessels into collision, and she is held to be at fault.

The Frampton violated article 28 (Comp. St. § 7867), which requires that, when vessels are in sight of one another, the steam vessel under way taking any course authorized or required by the rules shall indicate that course by a signal or whistle; that is, one short blast, to mean that she is directing her course to starboard. It is admitted that no whistles were blown by the Frampton when she changed her course about 2 miles away. Since the vessels were navigating on crossing courses, the failure to blow such whistle condemns the navigation of the Frampton. This unannounced change of course contributed to the vessels coming into collision. If the whistle had been blown, as the Comus' watch officer asserted, he might have changed his course and ported the Comus' helm, in order to pass port to port. Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218; The Manitoba, 122 U. S. 97, 7 S. Ct. 1158, 30 L. Ed. 1095; The Cushing (C. C. A.) 292 F. 560; Yang-Tsze Ins. Ass'n v. Furness, etc. (C. C. A.) 215 F. 859.

The Frampton has not sustained the burden resting upon her of showing that her failure to signal did not contribute to the collision. It is also clear that the lookouts and navigating officers of the Frampton, who saw the Comus, were inattentive to her navigation. If the Comus changed her course by starboarding, the lookout should have observed and reported it. It was inattention by those on the Frampton which caused a failure to observe the change of the Comus' lights and thus the course of her navigation. The Framp-

tun's watch officer and lookout should have seen the Comus' green light when she turned.

It is an insufficient excuse to say that the Comus' helm was not put hard over until a few seconds before the collision. Nor may they be excused for their failure to see the range light change until the Comus was within 10 feet, as they now claim. If the collision occurred as stated by the appellant, the Comus was under a starboard helm some minutes before the collision, and changed her heading fully eight points to bring about the collision. If this took about 5 minutes, as claimed, the lookout should have observed the change of course. Collisions caused by such failures have generally led to responsibility being placed upon such vessels. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; D. L. & W. R. Co. v. Central R. of N. J. (C. C. A.) 238 F. 560; The Prinz Oskar (C. C. A.) 219 F. 483.

Concluding, as we do, that the vessels were on crossing courses, the Frampton, like the Comus, was also charged with fault in failing to stop and reverse her engines in time to avoid the collision. She was kept at full speed ahead into the jaws of collision. Upon the admission of her watch officer, if the engines had been reversed, the collision might have been avoided. This constitutes careless navigation. Union S. S. Co. v. Latz (C. C. A.) 223 F. 402; The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126.

We do not think the angle of collision, which is in dispute, and which, upon the testimony of the Frampton's witnesses, was from 40 to 60 degrees, assists very materially in fixing responsibility.

[2] Both vessels were damaged by this collision. The commissioner allowed interest at the rate of 6 per cent. per annum, but the District Court ordered that interest on all items for each vessel be computed at the rate of 4 per cent., because this rate is provided by the Suits in Admiralty Act (Comp. St. §§ 1251¼–1251¼l). Where damages are recovered against the United States, appellee says that, upon grounds of equity, it should apply to the other vessels damaged in a common collision. The cases of The Commonwealth (D. C.) 297 F. 651, and New York & Cuba Mail S. S. Co. v. U. S. (C. C. A.) 16 F.(2d) 945, 1927 A. M. C. 230, construed a special act which allows an award of damages and interest the same as between private parties. In so far as the liability of the United States is concerned, the present suit is to be determined entirely upon the Suits in Admiralty Act, which limits recoverable interest to 4 per cent. No damages or interest would

have been recovered, but for this act. The question is not one for the application of equitable principles. The recovery is based entirely upon the matter of strict law. The appellant should be entitled to the legal rate of interest of 6 per cent. upon its full recovery. Its right to sue is not dependent upon any statute.

Decree modified as to interest recovered by the United States, and, as modified, affirmed.