## THE WINDRUSH.

## THE BUENOS AIRES.

### (District Court, S. D. New York. November 9, 1922.)

**1. Collision ⊜⇒45—Steamship held in fault for collision with bark at sea.**

A collision at sea on a clear night between a steamship and bark on approximately opposite courses *held* due solely to faults of the steamship, which was the burdened vessel: (1) In failing to sooner see the bark, either through inattention or because the lookout was stationed in the crow's nest instead of forward in the bow; (2) in not stopping and reversing at once when the bark was seen and her course could not be determined; (3) in changing her course, which took her directly toward the course of the bark.

**2. Collision ⊜⇒77—Lookout on steamship should be forward on deck.**

An elevated position on a steamship, as in the crow's nest, is not as favorable a place for the lookout as on the forward deck near the stem, from where objects near the water can be better seen at night.

**3. Collision ⊜⇒109—Duty to stand by; judgment of master.**

In conforming to Act Sept. 4, 1890, § 1 (Comp. St. § 7979), requiring the master of a vessel, after collision, to stand by and render needed assistance, if it can be done without serious danger to his own vessel, much must be left to the judgment of the master.

**4. Collision ⊜⇒45—Bark held not in fault for collision with steamship.**

A bark *held* not chargeable with fault contributing to a collision with a steamship at sea at night, where she kept her course, her lights were of proper kind and burning brightly, and she had no reason to anticipate collision until too late to prevent it, and any action then taken was in extremis.

**5. Admiralty ⊜⇒21—Suit for wrongful death on the high seas.**

The right of action for wrongful death on the high seas, given to personal representatives by Act March 30, 1920, became a part of the general maritime law, as that law is applied by the federal courts, and where the fault of a foreign ship on the high seas causes the death of a seaman on an American ship, a federal court of admiralty has jurisdiction of a suit in rem to recover for such death, which is not controlled as to the right or procedure by the law of the country of the ship, though the measure of recovery, where it gives the right, may be enlarged by such law.

In Admiralty. Suit by Thomas H. Shepard, managing owner of the bark Windrush, with five other suits by the cargo owner and the administrators of deceased seamen, against the Steamship Buenos Aires; the Compania Transatlantica De Barcelona, claimant. Decrees for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and J. Harvey Turnure, both of New York City, of counsel), for bark Windrush and owners.

Bigham, Englar & Jones, of New York City (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for West India Oil Co.

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., George C. Sprague, and Arthur H. Haaren, all of New York City, of counsel), for the Buenos Aires.

J. Harvey Turnure, of New York City, for administrators.

⊜⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HAZEL, District Judge. These are separate libels for the recovery of damages sustained by reason of a collision between the three-masted steel bark Windrush, an American vessel, 240 feet long, built in England in 1892, and classed 100–A1 by Lloyds, and the Spanish passenger steamship Buenos Aires, 420 feet long, 48 feet beam, drawing 30 feet of water, bound from Cadiz to New York, occurring on May 10, 1920, in the Atlantic Ocean, about 1,000 miles east of Sandy Hook. The various libels were consolidated, and were all tried together by consent of proctors as a single case. The bark, which was bound for Montevideo, was sunk, her entire cargo of refined petroleum lost, and 5 out of 18 members of her crew were either drowned or died of exposure. The libels are on behalf of the owner of the bark, the owner of the cargo, and the administrators of the sailors who lost their lives.

It was in the early morning, in a moderate sea, the weather concededly clear, and a moon shining at times through the clouds, with southwesterly winds blowing at the rate of about 8 miles per hour, and the bark sailing on the starboard tack 6 points from the wind, all her sails set, except her royals, foretopgallant sail, flying jib, and gaff topsails, which were furled. The second mate, Rice, who was in charge of the watch, was aft, a seaman at the wheel, and a competent lookout stationed forward on the forecastle head. It is claimed by the bark that her green and red lights were properly set and bright in the small lighthouse towers on the port and starboard side of the forecastle head. At about 2:10 or 2:15 a. m. (that is, between 4 and 5 bells on the bark), when sailing S. E. ¾ E. by her steering compass, and making 3½ to 4 knots per hour, her lookout discerned and reported a masthead light of a steamship, which afterwards proved to be the Buenos Aires. She was then distant about 4½ miles, bearing 1 or 1½ points on the bark's starboard bow. In acknowledgment of the report of the lookout, the second mate walked forward and looked at the side lights of the bark, and inquired whether they were burning brightly, and the lookout replying that they were, he walked back aft. The lookout again at 2:31 o'clock, about a minute before the collision, looked at the side lights and, as was the custom aboard the bark, announced that the lights were burning brightly, while the second mate audibly acknowledged receiving the report. The witness Vantti testified that he heard the lookout, Plees, report that the lights were burning. In a short time after the steamer was sighted she displayed her red side light to the bark, and the officer and the lookout evidently thought she would pass clear on the bark's starboard bow.

Libelant's witnesses testified that the night was clear, with the moon shining about 20 ° above the horizon, the last quarter of the moon not having come; that few stars were visible, and light cirrus clouds hovered in the sky; that no danger threatened as the vessels came nearer to each other, until suddenly the steamship without warning changed her course directly toward the bark, which had continued on her course as the rules of navigation required; but when the steamship was about 80 yards distant, and collision imminent, the bark, intending to avoid contact, starboarded her helm; the steamship,

however, coming ahead, struck the bark on her right side a little for-
ward of amidships, going into her as far as her mainstay, or nearly
19 feet. Upon backing away, she lay to a quarter of a mile off, while
the bark sank in a few minutes. Her lifeboat on the starboard side
was crushed by the impact, and before that on the port side could be
lowered she went down. Her master and her wheelsman climbed up
the steamer's anchor chain, while her prow was indented in the bark,
and were lifted to the deck. The crew were thrown into the sea, and,
clinging to wreckage, the survivors were rescued at daybreak by the
steamship.

The version of the Buenos Aires is that the moonlight was visible
at times only, with nimbus clouds floating across the sky, sometimes
covering the moon and interfering with visibility, but concededly it
was a good night for observing lights. At about 3:10 a. m., while pro-
ceeding north 86° west at 9½ to 10 knots an hour, her lookout, who
was in the crow's nest (which was 58 feet above the deck and 42 feet
forward of the bridge), made out a strange object off 2 points on the
port bow, which he thought at first was a cloud; but he nevertheless
signaled three bells to the chief officer on watch, who testified that he
saw no lights on the strange object; that he looked through binocu-
lars, and discerned an immovable, shadowy, bulky form or mass 2
points on the port bow, and he could not determine what it was; that
at first he thought it was an abandoned steamer, but he supposed it
could have been nothing but a sail boat, and he at once directed the
wheelsman to starboard, blew a whistle, placed the telegraph to the
signal "Attention," directed calling the captain, who was asleep, again
gave a whistle signal, and then, observing the sails of the bark, or-
dered the steamer full astern, but in a moment the collision ensued.
He asserts that only 1½ minutes elapsed between the time of receiv-
ing the three-bell signal from the lookout and the impact. The master
of the Buenos Aires, upon being awakened by the apprentice officer,
quickly dressed and hurried to the bridge, but before he arrived there
the vessels collided. He ordered an examination of the steamer's hull
to ascertain her injuries, but there was no material impairment,
though some damage forward. After backing away to starboard
from the bark, the steamship stopped her engines and lay about a
quarter of a mile off from where the bark went down, and, after
throwing illuminated life buoys overboard, moved about and around,
looking for survivors, but found none. She lowered no boats, but at
daybreak, or nearly 4:30 o'clock, her lookout in the crow's nest dis-
covered seamen on floating wreckage, who were later picked up, five
being dead from exposure, including Rice, the second mate of the
Windrush, while one Bachmann died in the ship's hospital. When the
floating object, the bark, was first observed it is claimed by the steam-
ship to have been from 1,400 to 2,800 feet away from the steamer.

[1] Libelants attribute the disaster to the gross faults of the steam-
ship, in that, first, her lookout was incompetent; second, for failing
to immediately stop and reverse; and, third, for negligently porting
and going to starboard across the bow of the bark. It was the duty
of the steamship to keep clear of the bark. If the latter's green light

was bright, it should have been seen by a competent lookout fully 7 or 8 minutes before the collision.

It was the bark's statutory duty to have proper side lights, and the principal question in the case is whether her green light on her starboard side was burning brightly. Upon this material point the testimony on the part of libelants was that the light was lit and burning brightly, while on the part of the steamship that no light was observed. All agree that it was a good night to see lights, and I am constrained to the view that on one side or the other there has been a perversion of the true facts. If, as libelant asserts, the green light on the bark was properly set and burning, it surely was visible to the lookout on the steamship, had he been in a proper place for observation and vigilantly used his sense of vision. The chief officer and lookout were grossly unmindful of their duties and obligations, unless the green light of the bark was in fact extinguished, or so dim that it was invisible to them. There are facts and circumstances which tend to support the testimony of each side in this particular. Both vessels were required to exercise vigilance in their navigation, although a stricter degree of vigilance was required of the steamer, since the darkness, the clouded moon, or even the absence of light would not exempt her from responsibility for the collision while the bark was going in her course, if the steamer was aware of her proximity, for in such case she was obliged to take fitting measure to avoid her. The bark, of course, was bound to exhibit an efficient light. The statute (sections 7838–7841, Comp. St.) required her to exhibit a proper red light on the port side and green light on the starboard side visible for a distance of two miles.

It is unnecessary to treat of all the details relating to the light and its visibility. Careful consideration on my part of the evidence warrants the conclusion, I think, that the starboard light just before the collision was burning brightly. That the lookout swore the lights were bright, and that he especially looked at them, affords no reason for entertaining suspicion as to the verity of his testimony. The Alice B. Phillips, 81 Fed. 415, 26 C. C. A. 467. It is true that the testimony of Dermody relating to his cleaning of the side lights and trimming the wicks on the preceding day is somewhat vague and indefinite. He was uncertain whether they were cleaned and the wicks trimmed on the day before, or within two days of the mishap. The steward, however, swore that he saw him clean and trim them on the preceding day. Trimming the wick with a knife, instead of shears or other suitable instrumentality, was not a good way of performing such a service; but any failure in this relation does not afford sufficient ground for rejecting the clear and explicit testimony of the lookout that, after sighting the steamship, the green light was burning properly, and so continued to within a minute of the collision. It strikes one as almost incredible that the green light was not observed on the steamship by the lookout and officers on the bridge to whose faithfulness the lives of passengers and crew were committed. Indeed, one is almost persuaded that there must have been something defective about the bark's light, either in its location or dimness, that interfered with

its visibility. But, on the other hand, it is equally incredible that the watch on the bark, who were apparently competent and reliable, would at the customary bells report and hear reported that the side lights were burning efficiently when they were not, or when the green light was extinguished or dim. It is difficult to believe, if that had been its condition, that it would not immediately have been remedied. Certainly, after the Buenos Aires was sighted, something would have been done by the mate on watch to warn her of the proximity of the bark and her course. Self-preservation would immediately have prompted other means of attracting attention, and at least there would have been no delay in arousing the master, who was asleep below just before the impact. When danger was realized, no rockets or flare-up light to give warning would in my opinion have been of service, although the second mate procured a lamp from the chartroom intending to attract attention, but it blew out a short time before the collision.

[2] Consideration of all the evidence and probabilities arising from the situation constrains me to the view that the lookout in the crow's nest and chief officer on the Buenos Aires were either not sufficiently attentive to their duties, or their position on the steamship interfered with proper observation. It has been held that a lookout in the pilot house or on the bridge, or in some instances the crow's nest, is not a sufficient compliance with maritime law. The statute does not prescribe where the lookout should be to discharge his duties, though the courts have repeatedly held that he must be placed where he can best hear and see objects on the water, and his proper position is generally understood to be in the forward part of the vessel, either at the bow or stem. An elevated position on a steamer is not regarded as favorable a place as that on the forward deck near the stem. The Ottawa, 3 Wall. 268, 18 L. Ed. 165; The Prinz Oskar (D. C.) 216 Fed. 233, affirmed 219 Fed. 483, 135 C. C. A. 195.

In The Prinz Oskar, the steamer contended that the schooner Georgetown was not exhibiting side lights, and therefore she was not seasonably observed by the steamer's lookout, who was located in the crow's nest on the foremast as the vessel entered Delaware Bay. The Circuit Court of Appeals emphasized this view by saying that it was the imperative duty of tall steamers to take every possible precaution with a low-lying sailing vessel, and that among these precautions courts have recognized that of placing the lookout as low and as far forward as possible. It is true that the collision occurred at the entrance of Delaware Bay, a vicinity where, as the court said, she was likely to meet low-lying sailing vessels engaged in coastwise traffic. In The Michigan, 63 Fed. 280, 11 C. C. A. 187, dealing with a collision 9 miles off Cape Henry in the Atlantic Ocean, the lookout was on the lookout bridge 30 feet above the water, 40 feet back of the stem of the vessel, and the court held that in such position it was impossible for a lookout to make proper observations at night and in hazy weather; that "masters of ships are not at liberty to adhere to machine rules in matters as important as the duties of lookouts."

These adjudications, and others dealing with this subject, induce me to the view that, because of the darkness of the water on the night

in question and the cloudy sky at intervals covering the moon, in the exercise of a proper degree of care it was either required that an additional lookout should be stationed forward near the stem of the Buenos Aires, or that the lookout in the crow's nest should have been placed forward on the deck in the bow, where he could keep a better lookout for sailing vessels like the Windrush, lying low on the water and whose side lights were 20 feet above the water line.

The testimony that the captain was not called until the approaching steamship ported, and menaced the safety of the bark by going to starboard, is indicative of the belief that both the mate and lookout up to this time fully expected the steamer Buenos Aires to pass at a safe distance. Capt. Vives and numerous passengers aboard the steamship, who came on deck directly after the collision, testified that they saw no light on the bark, though they looked for one. The probabilities arising from such testimony, assuming that the jar of the collision did not extinguish it, had not been overlooked. The arguments of proctors for libelants, however, that since the bark heavily listed to the right side the probabilities are that her sails spread over the light towers and obscured the green light or changed its arc, are not without reasonable force. The testimony, therefore, that no light was observed on the bark after the collision, is not of material importance. The passenger Mayo, who testified that from his berth at about "2 o'clock, or 2:15, or something like that," he put his head out of the porthole, and saw a sailing ship at a distance ahead, and lights, green and red, the green light facing the steamship, was perhaps mistaken, since the collision did not occur until an hour afterwards.

The steamship was also at fault for not stopping and reversing immediately, upon making out the bark, since the chief officer, Perez, admits that he thought from the first the bulky object was a sailing vessel. It is difficult to see why the engines were not at once stopped and reversed. The accident, it is true, happened very soon after the object was sighted from the crow's nest when it was about a half mile away. If the engines had then been reversed and the momentum stopped, while the bark was under speculative observation by the chief officer and apprentice officer, the collision would not have occurred. The steamer's log, giving it verity, discloses that the bark was in sight about 5 minutes before the impact. To omit stopping and reversing when such movements would have kept the ship clear was an act of negligence. The movements of the bark were uncertain to the chief officer; he experienced difficulty, he says, in seeing her, saw no colored lights, and at first he thought it was an abandoned wreck. The situation was one, in my opinion, that called for strict obedience to the rule of keeping clear, for the Buenos Aires was a burden vessel upon which the presumption of fault rests. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126. She could not be permitted to take chances for the danger of collision existed on the instant the bark or bulky object was sighted. It is, however, contended in opposition that the steamship was of the left-hand screw type and suddenly reversing would have endangered her safety. Her proximity to the object at this time, however, was such that it could be distinguished as a sailing vessel, and

if the steamship had stopped and reversed, as she could have done without endangering her safety, the collision would not have occurred. Manaway (D. C.) 257 Fed. 476.

Another fault assigned is that the steamship erred in changing her course to starboard and continuing full speed ahead. The effect of so doing was to swing the steamship across the bow of the bark. This was a serious fault, unless it is considered a fault in extremis, which in my judgment it was not, for Perez testified that he executed the movement, thinking he could avoid the object on the starboard side. But at this particular time he had discerned the sailing vessel. Instead of attempting to cross her bow, I think good seamanship required that she proceed under her stern. Had she done so, the collision would not have ensued.

[3] The point is next urged that prompt assistance to the seamen who were in the ocean was not given. The law (Act Sept. 4, 1890 [Comp. St. § 7979]) required that the Buenos Aires give such assistance in view of the circumstances as might be necessary to save the crew of the Windrush from danger, if possible without endangering her own safety. Libelants' testimony is that about 3 hours elapsed before the seamen clinging to wreckage in the ocean were rescued, while that of the steamship is that the rescue was at 4:30 a. m., or 1 hour and 20 minutes after the collision. There evidently was some delay in lowering boats. If boats had been lowered right away, or say within a half hour after the collision, there might have been an earlier rescue; but this is purely speculative. It must be conceded that the first duty of the master of the Buenos Aires was to establish the safety of his ship and passengers, and hence any reasonable delay ensuing from an examination of the hull, to ascertain her condition and extent of her injuries, does not militate against her. Moreover, the sea was considered rough by him, and in the exercise of sound judgment and discretion he believed it best to wait until the break of day before lowering any boats. He stood by and watched and sailed around in the darkness. after throwing over illuminated buoys, and the lowering of boats would have enabled discovery only if by chance the boat searched within 30 or 40 feet of the seamen. Expert witnesses for libelants have sworn that a reasonable length of time, in view of the conditions, to have put a lifeboat into the water to effect rescue, would have been anywhere from 5 to 20 minutes, and that it would have been better to lower boats immediately on finding out that the steamship was uninjured; but I nevertheless think that in such a case the judgment of the master should not be lightly overlooked. Boston Towboat Co. v. Winslow, 76 Fed. 595, 22 C. C. A. 327. The adjudications cited by libelants on the point are all based on a vessel at fault actually skipping away, in the hope of being relieved of responsibility, or not standing by and offering assistance. Such was not this case.

[4] As to the asserted negligence of the bark, I find, in addition to the finding already made, that the green light was burning properly; that the lighthouses for containing the side lights were properly constructed and of the kind carried by numerous sailing vessels. The burners were of the simplex type without globes, which were not regarded

286 F.—17

necessary, since the construction of the lighthouses kept wind and air from coming into the interior. The witnesses Pilcher and Cocks, for the steamship, say that globes are usually used in side lights, to keep the light from smoking and lessen chances of the light blowing out for lack of ventilation. But in opposition it is shown that Dermody, who cleaned the lights, testified that the lights, though without globes, smoked very little; that the smoke would collect on the top of the lamp, and not on the globe; while Capt. Roberts, of the Windrush, testified that, though lighthouses and lights without globes were on the bark since 1912, he knew of no instance when any lights in use went out. Milliken, steamboat inspector, swore that simplex burners of the type on the Windrush were in common use, and ordinarily were not equipped with chimneys; that he thought it was a proper burner to use without chimneys.

It is next contended that the Windrush was to blame for not attracting the attention of the Buenos Aires after she noticed that the latter did not change her course. I have already treated of this feature, holding that failure to use a flare-up light or rockets was not a contributory fault, since the watch had no reason to expect a collision until it was too late to give additional notice of the bark's presence. It is contended that the Windrush was at fault for directing her course to port just before the impact; but the proofs are that she kept her speed and course as long as it was believed the steamship would safely pass, but her turning to starboard, instead of to port, simultaneously blowing four blasts of her whistle, indicating that the collision would ensue, was a justification for the bark to do something to avoid the disaster, and her helm hard up movement, if the bark responded to it, was a fault in extremis, which primarily was caused by the prior negligence of the steamship. The Stifinder (C. C. A.) 275 Fed. 271. She was close-hauled, but failure under the circumstances to luff in my opinion was likewise excusable, by reason of the exigencies presented by the negligent navigation of the steamship. The Seagull, 23 Wall. 165, 23 L. Ed. 90; The Carroll, 8 Wall. 302, 19 L. Ed. 392.

My conclusion is that it was the duty of the lookout of the Buenos Aires to seasonably discover the bark; that there should have been a lookout on her forecastle head; also that the chief officer on the bridge should have perceived the bark before he did, and should have stopped and reversed on seeing a bulky mass ahead, instead of continuing ahead; also that the steamship was at fault for going to starboard across the bow of the bark. Her faults were sufficient to account for the disaster. Any asserted faults in the management of the bark or failure to have efficient lights have not been proven. It was necessary that the evidence should clearly and convincingly establish the fault on the part of the bark in order to warrant any apportionment. The Buenos Aires being solely at fault for the disaster, a decree against her for the whole damages sustained by the owner of the bark and the owner of the cargo may be entered.

[5] In any event it is contended there can be no recovery on the death claims, since the Buenos Aires was a Spanish vessel, and as the casualty was on the high seas, beyond the jurisdiction of any nation,

this court is without jurisdiction. The stipulation herein provides that under Spanish law a right of action existed in favor of the heirs or relatives of the deceased, but no right in rem and no right of action in an administrator. This action, however, was brought under the Act of March 30, 1920 (41 Stat. 537), relating to maintenance of actions for death on the high seas resulting from negligence, and it is not limited to the negligent acts of vessels of the United States on the high seas, to the exclusion of foreign vessels. Although the latter are not specifically mentioned in section 1, yet section 4 refers to a right of action on account of death by wrongful acts whenever the law of any foreign state grants such a right. This provision is not open to the construction that foreign law is to be applied in the federal courts, where a foreign ship through her fault on the high seas causes injury to sailors on an American ship. The high seas are the common ground of all nations, and, as said in The Brantford City (D. C.) 29 Fed. 375, are governed and determined by the general maritime law. Persons on board a foreign ship are considered a part of the territory of the country of her flag (Queen v. Keyn, 2 Ex. D. 63), and manifestly are subject to the laws of the state to which she owes allegiance, while the vessel, of course, on her voyage is amenable to the laws of the state to which she belongs. Lindstrom v. Inter. Nav. Co., 123 Fed. 475, 60 C. C. A. 649; La Bourgogne, 139 Fed. 433, 71 C. C. A. 489.

The contention that section 4 was included to prevent the limitation of liability of a foreign vessel under American statutes is believed not wholly without merit. Claimants argue that the actions should have been brought in personam by the relatives of the decedents, instead of in rem by the administrators of their estates; but I think the general maritime law must govern, regardless of the fact that the Buenos Aires was a Spanish vessel. Mr. Justice Bradley, in dealing with a similar question in The Scotland, 105 U. S. 24, 26 L. Ed. 1001, said:

"If a collision occurs on the high seas, where the law of no particular state has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would prima facie determine them by its own law as presumptively expressing the rules of justice."

The rule in England is the same. The Leon, 6 P. D. 148; Chartered Mercantile Bank of India v. Netherlands, etc., 10 Q. B. D. 521. The fact that Bachmann died after rescue aboard the steamship in neutral waters, or that the tort was committed on the high seas, does not divest this court of jurisdiction, but requires applying the general maritime law as administered in the United States. Prior to the act under which these libels were brought, it was held in this country that, where death ensued from negligence on the high seas, an action at law could not be maintained, in the absence of an act of Congress or of a statute of the state giving the right. Such right now being existent and in force before this right of action arose, it is a part of the general maritime law, as that law is applied in the federal courts. The power of Congress to pass the act is beyond question. The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264. That it became a part of the general maritime law of the country, in view of the stipulation that under Spanish law a right of action existed, is evidenced by The Lotta-

wanna, 21 Wall. 558, 22 L. Ed. 654. Neither The Alaska, 130 U. S. 201, 9 Sup. Ct. 461, 32 L. Ed. 923, nor The Lamington (D. C.) 87 Fed. 752, cited by claimant, supports the view that the Spanish law, to the exclusion of the general maritime law, is to be applied to this case in the libels for death.

In The Lamington the injuries were sustained by a seaman on a British ship on the high seas, and the District Court held that the negligence of the ship resulting from defective ropes for the gear of the ship was governed by the law of the place, and relief could not be given by applying the law of the place, and, since there was no such right of action by the law of the place, the libel was dismissed. But such adjudications are distinguishable, for here the libels are between persons or ships of different nationalities, having different laws. It is not necessary to further treat of this point. It must suffice for me to state that I am satisfied, from my examination of the authorities, that the Act of March 30, 1920, has bestowed upon this court the power to apply the general maritime law, as understood and administered in the United States, in such cases as these; that the law of Spain does not control the right or the procedure; and, furthermore, that the steamship may be proceeded against in rem. It is not claimed that McDougal, Persson, or Bachmann, the deceased seamen, were in any degree negligent. They were below in the bark at the time of the disaster, and did not participate in her navigation. Their representatives are entitled to full compensation for damages sustained by reason of the faulty navigation by the steamship Buenos Aires, in consequence of which death ensued.

A decree may accordingly be entered, with costs, in favor of the bark Windrush and of the owner of her cargo, and in favor of Harold Sturges Rankin, administrator of the deceased seamen, holding the Buenos Aires solely liable for the loss sustained by these various interests, and reference to a commissioner.